Argued January 13, affirmed May 12, 1954

# STATE OF OREGON *v.* KADER

270 P. 2d 160

*Nels Peterson* and *Frank H. Pozzi,* of Portland,

argued the cause for appellant. With them on the brief was Sidney I. Lezak, of Portland.

*J. Raymond Carskadon* and *Charles E. Raymond,* Deputy District Attorneys, of Portland, argued the cause for the respondent. With them on the brief was John B. McCourt, District Attorney, of Portland.

Before LATOURETTE, Chief Justice, and WARNER, ROSSMAN, LUSK, BRAND and PERRY, Justices.

ROSSMAN, J.

This is an appeal by the defendant from a judgment of the circuit court which found her guilty of the crime of manslaughter (ORS 163.040). The indictment charged that on January 23, 1952, the defendant, "by the use of the hands", killed her three-year-old daughter Sherry by asphyxiation. The indictment was appropriate to a charge of murder in the first degree. The defendant's plea was "not guilty."

The defendant submits assignments of error which challenge rulings adverse to her that (1) denied a motion made by her for a directed verdict on the ground of insufficiency of the evidence; (2) refused to instruct the jury upon excusable homicide; (3) instructed the jury upon the subject of consciousness of guilt; (4) permitted a medical witness called by the state to express an opinion concerning the cause of bruises which appeared upon the deceased's face; and (5) refused to order a state witness to produce papers from which he had refreshed his memory before entering the witness stand.

The face of the deceased child had discolorations under the chin, upon both cheeks and over the bridge of the nose. The state claims that January 23, 1952,

between 3:15 and 5:00 p. m. the defendant clasped a hand firmly over the mouth and nose of Sherry, causing the discoloration thereby and effecting her death through asphyxiation. No person who testified saw the purported act occur. The state also claims that after the defendant had brought about Sherry's death she cast the body into a sump upon the grounds of the East Side plant of the Portland Gas & Coke Company. The plant is situated a few blocks from the home which the defendant occupied. January 25, at about midnight, she led the officers to the sump and showed them the body floating in water which filled the lower two feet of the sump. The latter was seven feet wide and nine feet long. Its depth was about 12 feet. Old-fashioned cellar doors which met in the middle covered the top.

The defendant, 21 years of age, was the mother of two children, one of whom was the deceased Sherry, three years of age, and the other was Georgina, known as Vickie, four years of age. The trial judge ruled that, due to Vickie's tender years, she was not competent to give testimony. The defendant did not testify. The first assignment of error renders it incumbent upon us to review the evidence, especially that which the state produced. The evidence covers 1,225 pages. In addition there are many exhibits.

The defendant resided with her two children in the basement apartment of a house owned by her stepfather and mother in Portland, Mr. and Mrs. Eugene Sing. The Sings occupied the main part of the house. The apartment in which the defendant and her two children lived took up only a portion of the basement. In the remaining section were a flight of stairs leading to the first floor and some rubbish which included several small pieces of concrete. Although the Sings

occupied the main part of the house, we shall refer to the latter as the defendant's home.

The defendant cared well for her children. The Sings described her relationship with them as generally good. Mrs. Sing declared that "sometimes she was a little bit too severe with them," and Mr. Sing believed that she was "meaner" to Sherry than to Vickie.

A taxicab driver testified that Thursday, January 23, 1952, at a few minutes after 3:00 p. m. he drove the defendant and her two daughters home from downtown Portland. On that day rain fell intermittently. Precipitation occurred around 5:00 and 6:00 p. m. When the cab reached the defendant's home, the driver lifted the children from it across the wet parking grass to the sidewalk. In so doing he came close to the faces of the children. He observed nothing unusual in their appearance. Shortly after the defendant reached home she requested Mr. Sing to drive her to a postoffice station in that vicinity, but when Sing noticed that the time was 3:15 p. m. he told her that the trip would be useless, explaining that the station's hour for closing was 3:00 p. m. Sing then drove to his brother's restaurant and did not return home until 6:00 p. m. The evidence just reviewed, according to the state, shows that the defendant was with her children on the afternoon when Sherry was killed. It also shows, so the state claims, that at that time no bruises, marks or discolorations were upon Sherry's face.

At about 5:42 p. m. of that day (January 23) two police officers who were operating a prowl car received a radio call ordering them to go to the defendant's home. Two minutes later, when they spoke to the defendant, she told them, according to one of the officers, that about 15 minutes before they came her daughter Vickie, who had been playing outside, told her that

"an old man with gray hair, who was dirty, in a black car, had grabbed Sherry and—into his car and drove off." Upon hearing the defendant's statement, one of the officers telephoned to the central police station and the other drove the defendant and Vickie around the neighborhood in an effort to find Sherry and her purported abductor.

At six o'clock of that evening, P. E. Lippold, a sergeant of the Portland police department, called upon the defendant and was told by her that Vickie had said "the man had driven up, that he was an old dirty man, and that he had gray hair, similar to grandmother's hair, and that he was wearing coveralls with a zipper front; that it was an old dark sedan and dirty and that he had stopped and said, 'Hi, little girls, come over here.' And then that he grabbed Sherry by the arm and put her in the car." At 7:00 p. m. Lippold again spoke to the defendant. This time he was accompanied by two other members of the police department. He testified:

"And at that time she told us that now her daughter Vickie had changed the story somewhat, that Vickie told her now that she had not actually seen a man grab Sherry, but that the man had first grabbed Vickie and that Vickie broke away and ran towards the house and when she turned around again the man was driving off and she didn't see Sherry anymore; but she stated that Vickie had told her that she didn't actually see the man put her in the car as she had originally stated."

At 11:00 p. m. of the same day (January 23) Lippold again interviewed the defendant. This time he and a fellow officer (Nolan) inquired as to the father of the children and was told that the father was a Mr. George Dollarhide who lived in California. The

defendant expressed the belief that Dollarhide was not the person who had taken Sherry, for, according to what she told the officers, "the children knew George and that Vickie certainly would have known if that man that did pick up Sherry was George." She explained that Dollarhide had not seen the children "for over a year", but, later, as the interview progressed, said that Dollarhide had been in Portland within the last four months and had seen, not only the children, but also the defendant and Mrs. Sing.

The defendant's mother, Mrs. Sing, was employed in a Portland store. On January 23 the mother and the defendant's stepfather reached home at about 6:00 p.m. At that moment the defendant was upon the porch talking to a police officer. According to Mrs. Sing, the defendant "was kind of hysterical" and her hair "was hanging down like she was wet, and Vickie looked like she was wet too." She wore a coat. Sing also noticed the defendant's hair and, as a witness, described it as "all stringy, so wet. * * * both her and the girl was soaking wet." One of the police officers gave a similar account of the condition of the defendant's hair. The significance which the state attaches to the description just quoted will appear later. Presently the defendant told Mrs. Sing that "Sherry disappeared, that she was gone; she let her out to play and I don't know, all that." After the police officers had left and the defendant had accompanied her mother into the house the two had a conversation which the mother recounted in this way:

"A Well, naturally, I asked her what had happened and she told me again.

"Q And what did she tell you that time?

"A Well, just that Sherry was gone, she shouldn't have let them out to play, things like that.

"Q Did she tell you how Sherry had gone at that time?

"A Well, she just said that they were out to play and some man come along and Georgina come to the door and told her Sherry was gone.

"Q By 'Georgina' you mean Vickie came to the door?

"A Yes.

"Q And said that Sherry was gone?

"A (Witness nods head). Then Georgina told me that the man had yellow boots on, and then I tried to talk to her to find out exactly what the man looked like. I thought maybe it would help."

The events which we have so far mentioned occurred, so the witnesses swore, Wednesday, January 23.

Thursday, January 24, the police continued their investigation into the disappearance of Sherry. At about 9:30 a. m. J. H. Braley and Albert Eichenberger, both officers in the police department, accompanied by two members of the Federal Bureau of Investigation, called upon the defendant. Braley testified that Eichenberger and the two federal officers questioned her about the purported disappearance of Sherry and that while the questioning was in progress he played with Vickie. We now quote:

"I was merely—as I like youngsters, I was merely entertaining the, Mrs. Kader's daughter that was there, and talking to her and playing with her toys and so forth while Detective Eichenberger talked to Mrs. Kader."

Presently the defendant directed her attention to Vickie, so Braley swore, and said, "Vickie, don't talk to that man any more." Eichenberger, referring to the same incident, testified:

"Well, yes; it was during the time that I was talk-

ing to Mrs. Kader that Detective Braley was talking to Vickie in the other room, and at one time Mrs. Kader says to me, she says, 'Well, does that man have to question that girl?' 'Oh', I said, 'I don't think that he's really harming the girl or bothering the girl any.' I says, 'It seems to me as though they are having a little fun there on the davenport, I don't think that he is bothering her any.' * * * And then, later on, Mrs. Kader called to Vickie and told her to get off the davenport and quit talking and play."

William D. Browne, chief of detectives of the Portland Bureau of Police, also spoke to the defendant on the day following the purported kidnaping, that is, on the 24th. Although the defendant had told officers Lippold and Nolan the preceding evening that she did not suspect George Dollarhide, father of the children, she made contrary statements to Browne. Dollarhide had a sister who had displayed an interest in the children. According to Browne, the defendant told him: "It must have been them, Dollarhide and his sister in Los Angeles." At that point Browne communicated with the police of Los Angeles, San Francisco and other cities in an effort to locate the Dollarhides. Through the San Francisco police he was informed that Dollarhide had donated a pint of blood to the Red Cross on the afternoon of the purported kidnaping. The Los Angeles police reported that Dollarhide's sister was living in that city and that she was in Los Angeles on the day of the disappearance. Upon receipt of that information, Browne spoke to the defendant. The following is taken from his testimony:

"I called Mrs. Kader on the telephone and told her that we had located Dollarhide and her answer was, 'Well, has he my baby with him?' I said 'No.' Well, she practically said nothing."

Shortly after that conversation Browne sent for the defendant. We again quote from his testimony:

"I talked to Mrs. Kader and asked her why she had told her daughter not to talk to me or give me any information.

"Q  What did she say?
"A  She said, 'You are a very poor policeman, I would think that you would be trying to find my child instead of questioning my daughter and I.'"

Joseph H. Blewitt, a member of the police department's homicide detail, interviewed the defendant January 24. Blewitt was accompanied by other members of the department, including one Robert McKeown. The questioning occurred in one of the offices of the bureau and commenced at 5:00 p. m. In its course the defendant stated, so Blewitt swore, that on January 23, at 5:30 p.m., Vickie came to her with a report that "an old gray-haired man with coveralls, driving an old dark sedan, had taken Sherry away." Evidently Blewitt and McKeown doubted the defendant's story, for they plied her for details. According to Blewitt, she replied that "she knew nothing further." After a recess the session resumed at 9:00 p. m. The officers had decided to accuse the defendant of having brought about the death of Sherry. When they made the accusation they met with a denial. Next, a new tack was taken which McKeown described in this way:

"Mr. Blewitt—happened to start talking to her more or less like a child. We said, 'Well, just play acting, suppose we were just making believe that somebody had done away with their child, what would they do with them?' She perked right up at this. 'Well,' she said, 'just play acting, suppose that this little child was accidentally killed by another little child, would she go to the penitentiary?' So we asked her, well, how old was the other child

about, and she says, 'Well, supposing that she might be four and a half or five, young', and we told her that nothing would happen to a child that young, and she says, yes, but supposing an older person, an adult, had assisted afterwards in getting rid of this child, would she be prosecuted?''

After further questioning in similar vein, accompanied by admonitions to the defendant that she ought not permit the body of her daughter to remain unburied, the defendant told the officers, according to the testimony of both, that she would take them to the place where Sherry's body lay. The hour was 11:30 p.m. The two officers, accompanied by the defendant and a member of the Women's Protective Division, thereupon entered a police car and, obedient to the directions of the defendant, drove to the East Side plant of the Portland Gas & Coke Company, which is located a few blocks from the defendant's home. Upon reaching the plant, the party entered on foot an area occupied by large storage tanks. Eventually the defendant came upon a large covered sump and, pointing to it, said, "There she is." When the lid was removed and a flashlight was turned into the dark pit Sherry's body was seen floating in water at the bottom of the pit. Evidence which the jury could reasonably believe indicated that death had occurred about 48 hours previously. After the defendant had shown the officers the body, she and they went to the defendant's home. Then the coroner removed the body from the sump.

In the automobile on the way to her home, the defendant, according to Blewitt's testimony, said that after she returned home from the taxicab ride on January 23 she noticed Vickie standing in the kitchen and

"asked her if anything was the matter and Vickie said she was afraid to say. And, according to Mrs.

Kader, when she questioned Vickie, Vickie said that they had been playing soldier. This conversation took place enroute from the Gas Company to the residence, and after we reached the residence— I don't know just where it breaks there—anyway, she continued to say that she went in through her bathroom into the basement in back of her apartment and at that time she found Sherry lying at the foot of the stairs. She spoke to Sherry and she didn't answer and that, when she examined her, she wasn't breathing, or she didn't believe that she was breathing.''

The defendant told the officers that she believed that Vickie had caused Sherry's death and that she did not want her to be arrested. Blewitt, going on with the account which he said the defendant gave, partly in the car, partly in the defendant's home and the remainder in the police station, continued as follows:

''She says that she took Sherry half way up the flight of stairs, rolled her down the stairs four or five times to bruise her so that it would appear as though some man had beaten her. After she had rolled her down the stairs four or five times, she put her little boots on, put her over her shoulder and carried her down to the sump where she deposited her.''

Officer McKeown, in relating the account which the defendant gave on the trip from the gas works to her home and from there to the police station, testified that, according to it, Vickie ''had a funny expression, the way she put it, on the face, and she asked her what was the matter and the little girl said she was afraid to tell her.'' It was at that point that Vickie, according to the account, said that the children had been playing soldier and that ''the soldier had hit Sherry.'' Then, according to the account, the defendant coached Vickie ''into telling the kidnap story and of even taking her

outside and showing her a gray-haired man that was getting into an automobile and telling her that was the man that's got Sherry.''

After the officers had remained in the defendant's home for about 20 minutes and had taken notice of the staircase, the party returned to the police station where the officers continued their questioning of the defendant. One of them explained to her that they thought that she ''was shielding someone else and we didn't want her to suffer for a crime that she hadn't actually committed.'' Before long the defendant expressed a wish to make a written statement. At that point a stenographer was called and while the defendant spoke, the stenographer typed her words. The defendant signed the statement. A copy of it follows:

''I, Jada Z. Kader, do hereby give the following statement of my own free will, without threats or promises being made me by the detectives taking this statement:

''I, Jada Z. Kader, 21 years of age, born in Los Angeles, Calif. May 31, 1930, mother of Vickie LaVerne and Sherrie Ellen; now residing for past month at 2605 SE 13. Wednesday, January 23, 1952 we got up at about 9:30, ate breakfast, did the houseworks while the kids played, then I knitted on the hat until we ate lunch. After we ate lunch we sat down and read Bengi Engine, then stacked the dishes in the sink and we got ready and went over town. We got off the bus over-town, first we went to Kresses, we looked around there, then we went to Newberrys and spent 10¢ of their allowance on cookies and they rode on the 10¢ horse. Went up the ramp to the second floor, bought yarn. Then we went to Fred Meyers and got some pictures, then we went over to Meier & Frank and they picked out what they wanted for dinner; went to the restroom and I asked the colored lady in there which way to get out of the store. As we came out of the door

we saw a cab sitting there, we took it and went home. I think it was a Broadway Cab. We went in the house and put the packages away; I fixed a package to mail. I was sitting on the davenport and the children were playing in the basement like they always do. I went in the bathroom and got the oil-can and went out to get the oil. The oil used to sit by the front door. I made about 3 trips to fill the tank on the stove. I took the can back to the bath-room where I kept it. I saw Vickie standing in the basement, she looked so funny. So I went into the basement, through both the doors back of the bath-room. Sherrie was laying kind of sideways at the bottom of the stairs and that's when I found her.

"I told Vickie to go in the other room and play. After Vickie left I just looked at her, she wouldn't say anything to me. I asked Vickie, she was in the kitchen, what was the matter with Sherrie. She said "I'm afraid to tell you this mamma, Sherrie got hit by the soldier." I went back to see her again, I just kept thinking it didn't happen. Then she wouldn't breath or anything, that's when I tried to think of what to do. I sat there a long time and tried to think; no one else was in the house. I thought it all up myself, what to do. The only thing I could think to do was to say somebody took her; to make it look like somebody took her I carried her up the stairs and rolled her down. I did this about five times, maybe more, I don't think I hit her with any of the concrete to make it look worse, I didn't think of doing that but I wanted it to look as though some man did it. She was all dressed except her boots and mittens. She didn't bleed. I vomited and was in there awhile; I went in to Vickie again and told her just to pretend it was like a dream. I told her not to ever say anything about playing soldiers. I told her this so she would never say how Sherrie got hurt. I felt like I was two people, watching myself do it. I shut my eyes and put her boots on. I took her (Vickie) in to take a nap, I sat down again. I carried Sherrie out my door onto SE 13th, went west

on Ivon, carried her in my arms down to the gas works, I was looking for a place to put her, across the field, it was raining; I carried her down the bank. It was dark, I found a box-like place (I didn't know it went way down). This is the place I led the detectives to tonight. After leaving Sherrie there I went home, I saw a dark car with grey-haired man in it, parked near. I took Vickie outside and showed her the man and said 'That man's going to keep Sherrie for us' or something like that. Then I went upstairs and tried to call my mother, then I called the police. I thought of telling them but they always asked about the man so I decided never to tell the other.

"I have read the above and these are the true facts of this case.

(Signed) Jada Z. Kader."

After the defendant had signed the typed statement, the officers told her that they did not believe that a woman of her small size could have carried for the required distance a body weighing more than 30 pounds and asked her whether "a boy friend had helped her." According to the officers' testimony, the defendant answered by attributing the death to Mr. Sing. McKeown, in giving her answer, spoke as follows:

"* * * little Vickie had come to her and told her that Sing had pushed Sherry down the stairs; and that she had come in and she heard him say keep her, in her language, her 'God damn kids out of the upstairs.' She told Sing that the child wasn't breathing and he didn't believe her. She got down, and looked at him, and then when he found out, he sat her down on the stairs and told her that she wasn't to tell anybody. He told her this story that she was to tell Vickie about the kidnaping. He told her the story that she was to tell about the soldier hitting her in the head. Said that Sing helped her put on the boots and the mittens, and that he took

the child and she never saw it again. But later the next day that he had told her that he had dumped the child in over at the Gas Works.''

After the defendant had made that explanation, the officers confronted her with Mr. Sing. At that juncture she declined to repeat the statement which accused him of Sherry's death. Both at that time and also as a witness, Sing denied any knowledge of the manner in which Sherry had come to her death.

The witnesses whom we have mentioned met with no express contradiction and, so far as we can observe, the jury could reasonably have believed them. The only other testimony which is sufficiently material to the assignments of error to warrant a review came from Dr. Howard L. Richardson, a witness for the state, and from Drs. Normal L. Bline, Kenneth Livingston, Charles M. Grossman and Jeff Minckler, witnesses for the defendant.

Dr. Bline is a specialist in radiology. After being shown X-ray photographs of the skull of the deceased, he testified that they showed a fracture ''extending across the parietal bone'' above the right ear. He expressed a belief that the fracture ''could possibly'' have occurred during the autopsy. Dr. Richardson later swore that he produced the fracture in performing the autopsy and showed how he had done it.

The brief submitted to this court by the defendant's counsel says:

''It is conceded that death was caused by asphyxiation * * * To make this point even clearer, it may be stated that everybody agrees that the main airway was blocked and that this caused the death.''

The state and the defendant disagree as to the agency which shut off the child's access to air. The state

claims that the agency was the hand of the defendant clapped tightly over Sherry's nose and mouth. Dr. Grossman agreed that "if the hand is placed in the proper way it can cause obstruction to the air passage." The defendant claims that asphyxiation came about in this way: a blow upon her head rendered the child unconscious. Thereupon a regurgitation of food occurred which filled the air passage. In the meantime, through involuntary action, the glottis closed. The closure of the latter may have been induced, according to the defendant's theory, by stomach acids which came into contact with the glottis when the regurgitation occurred.

Dr. Richardson gave testimony in support of the state's theory. Drs. Livingston, Grossman and Minckler supported the defendant's theory. Drs. Livingston and Grossman did not see Sherry's remains. Dr. Minckler made a cursory examination of them but not until after the autopsy. He did not depend upon what he had seen when he gave his testimony. The deductions drawn by Drs. Livingston, Grossman and Minckler were based upon facts disclosed by Dr. Richardson's autopsy and their medical knowledge.

January 26, 1952, Dr. Richardson performed the autopsy. It was evidently thorough, for in its course he removed and examined all of Sherry's organs. He even cut the skull from the body and examined the brain tissues for the purpose of ascertaining whether any hemorrhage had occurred. Before making the autopsy, Dr. Richardson took photographs of the body, not only by the usual process which yields photographs in black and white, but also by color photography which produces slides that are projected, life size, upon a screen. All of the photographs became exhibits and the colored ones were used for the purpose of showing the discolorations upon Sherry's face.

Dr. Richardson found an area over the left ear of the deceased, about two inches in diameter, which he termed a hematoma. The fracture in the skull which Dr. Bline mentioned, and which Dr. Richardson swore was caused during the performance of the autopsy, was upon the right side of the skull. The hematoma occurred before death. It was a swelling under the scalp about two inches around and somewhat less than a half inch in thickness. In layman's language, it was a welt or bump. No witness knew its cause. However, Dr. Richardson stated that it could have resulted from a fall or a blow. He did not believe that it was caused by any of the cement blocks in the basement of the Sing house because, according to him, the sharp edges of a block of cement would have pulled out some of the hair and would have made a laceration in the scalp. Dr. Richardson examined the brain structure for the purpose of determining whether there was any evidence of hemorrhage. He found none. He did not know whether the blow which caused the hematoma could have rendered the child unconscious.

Dr. Richardson described in detail the discolorations upon the cheeks, the chin and across the bridge of the nose. He believed that they occurred before death. They displayed, so he said, a definite contour, circular in form, and could have been made by a hand held tightly over the nose and mouth.

Dr. Richardson's autopsy disclosed no evidence of water or algae in the lungs. As we have said, it is agreed that the cause of death was asphyxiation. The evidence just mentioned not only shows that drowning was not the cause of death, but it also establishes that Sherry did not breathe after her body was cast into the water at the bottom of the sump.

Dr. Richardson found no bruises upon the back, chest, arms, legs, knees, elbows, torso or abdomen of

the body. The heart, according to him, was "tremendously dilated" and there were excessive quantities of blood in the liver, spleen and lower organs. He explained the dilation of the heart by saying that it was filled with blood which it was unable to pump through the pulmonary circulation. The liver and spleen are secondary reservoirs of blood, so he explained, and when the heart is unable to force the blood on its way it backs into those reservoirs.

The examination made by Dr. Richardson of the remains disclosed, in addition to the foregoing, the following: (1) vomitus which filled the nose and mouth; (2) a few particles of food in the trachea; (3) no particles whatever of food in the bronchi; (4) a ballooning of the lungs; and (5) a swelling of the glottis which constricted it to a passageway the size of a lead pencil's point.

The following states Dr. Richardson's belief of the manner in which death occurred; in giving it he employed charts:

"From the food particles being retained within the nasal passages, the main airway of the nose, and from the food particles being retained in the mouth and the mouth cavity, and no food particles being found in the lung substance or in the main tubes (indicating throughout) something or some object prevented air from coming back in the nose and nasal passages or the mouth and taking that food into the lungs.

"Q So, it is your testimony, then, is it, Doctor, that the air passages were completely shut off causing the death of the individual?

"A Yes.

"Q Doctor, with the contour of the bruises upon the face, what is that contour?

"A Well, it is across the bridge of the nose (indicating) and under the chin (indicating).

"Q Can you describe the contour other than that?

"A Well, it is in a circular, a circular manner (indicating).

"Q Can you say, Doctor, as a matter of pathological science, if the air passages were not shut off, what would have been the condition of the lungs, assuming the mouth and nose were full of vomitus, assuming that the mouth and nose were full of vomitus as you found them?

"A And there was no blockage?

"Q And there was no blockage, what would have been the condition of the lungs?

"A Well, the natural event of asphyxiation and aspiration—that is this is unnatural, the findings here are unnatural—the natural events are that the vomitus and material that comes in here (indicating) is sucked back into the lungs, produces spotty areas of atelectasis or a frothy material if respiration continues back and forth and the individual drowns in their own fluid. That is their own body fluid they drown in. Such was not seen in this case. Instead these lungs were ballooned, the food was retained in the mouth and nose and a few little particles in the trachea, upper portion of the trachea.

"Q Assuming that the bruises that you found upon the face, do you have any opinion as to the manner and the force with which those bruises were probably applied?

(Colloquy)

"A I have an opinion that force was applied about the mouth and nasal areas and the side of the cheeks.

\* \* \* \* \*

"Q Do you have any opinion, Doctor, from your examination whether or not that force was applied to the bruises you have described under the chin and about the cheeks as considered si-

multaneously, considering the fact that the air passages were shut off?

"A As I previously stated, the various markings are of similar nature and similar age, and if applied simultaneously could in themselves shut off the nasal passages and the mouth passages. That is a force from the nose and under the chin could, could shut off those passages. * * * Examination of the bronchi and the terminal bronchials, both by histological microscopic examination and by washing out the bronchi and squeezing out the bronchi, revealed no evidence of food or food debris in these whatsoever (indicating). Instead the lungs were ballooned and filled completely with air. Nor did washing or examination of these demonstrate any evidence of a foamy, watery fluid or mucoid, watery fluid or an algae, none could be found in it."

Dr. Richardson, in the above way, expressed his belief that the little child's air passages were completely blocked by an outside force. In speaking of an outside force, he had in mind a hand held tightly over the child's nose and mouth.

We have mentioned the fact that when the body was recovered it was found that the mouth and nose were filled with food partially digested. The witnesses called that matter vomitus. Dr. Richardson explained its presence by saying:

"When anoxemia or lack of oxygen or a struggle takes place, the retching of the abdominal muscles, the retching of the chest muscles, automatically produces what we call antiperistaltic movement and the food comes squirting up into the nose and mouth."

It will be recalled that no particles of food were found in the bronchi or lungs. Dr. Richardson, as we have seen, swore that if an outside force had not closed the

air passages, food particles would have been "sucked back into the lungs." That is, the inhaled air would have carried them along the passages leading to the lungs. He accounted for the presence of the few particles in the trachea by saying that the movements to which the body was subjected after death may have forced them into that organ. It will be recalled that the glottis was not completely closed.

Dr. Richardson also testified:

"Q Sometimes, and then a child may receive a head injury, be unconscious, regurgitate, be unable to cough, strangle, and die within five minutes, isn't that true?

"A Yes. But the child would die by drowning in its own fluids which this child did not. It had none of those—in other words, whether they are unconscious or not, they will still—respiration will still keep going on.

"Q Unless—

"A And, the convulsions of even blockage of that type in the trachea will in turn produce the phenomena of in and out and furthermore we would have another thing which we do not see in this case, and that is segmental atelectasis which I have not gone into in the lungs."

Dr. Richardson swore that the amount of time required to produce death in the manner which he described varies with individuals. In many it might require about five minutes. We see from his testimony that he believed that a hand clapped tightly over the nose and mouth of the child could have shut off effectively her air supply. When that occurred, food would shortly belch up into the nose and mouth, but, since no air was passing into the lungs, none of the vomitus would make its way downward. In that way

he accounted for the absence of food particles in the bronchi. He thought that the partial closure of the glottis was possibly a "spasm of death."

We shall now portray more fully the defendant's explanation of the manner in which the asphyxiation occurred. The following, taken from the defendant's brief, introduces the defendant's theory:

"The injury or trauma causing the hematoma probably caused unconsciousness. Regurgitation in a child of Sherry's age under such circumstances was normal and the swollen glottis, which could have been caused by the irritation of regurgitated food prevented the great bulk of food from being aspirated or sucked back into the lungs. The fact that some food particles got into the trachea through the narrow opening of the glottis indicates definitely that the child was breathing after regurgitation."

Dr. Livingston testified that the blow which caused the hematoma "could have" produced unconsciousness, but, in the absence of additional facts, was unable to say whether or not it actually did so. He said:

"Knowing only the description of the scalp lesion, I think it would be difficult to say that it was probable, absolutely probable."

We quote further from his testimony:

"Q What is the frequency of occurrence of regurgitation following head injury?
"A That would be difficult to answer without qualification of head injuries that produce severe unconsciousness. That is, unconsciousness of more than a few seconds duration. Regurgitation is apt to occur in people who have a full stomach much more commonly than somebody whose stomach is empty, * * *."

Dr. Grossman testified that the hematoma indicated that the child had received a blow sufficiently

severe to have caused unconsciousness. We quote from his testimony:

"Q Now, then, Doctor, when—what is the effect of unconsciousness upon the respiratory system, in a three year old child?

"A The effect of unconsciousness on the respiratory system is a very variable one. However, the effect of head injury of a blow to the head such as this in addition to unconsciousness can cause regurgitation.

"Q And is that a common occurrence?

"A That is certainly not an uncommon occurence in head injuries. Nausea and vomiting and regurgitation is a fairly common occurrence.

"Q Can regurgitation itself cause a blockage of air passage?

"A Very definitely. It is a common cause of death.

"Q And need it be caused by blockage of air passage by food itself?

"A It can be caused by blockage of air passage by food itself. It can also be caused by spastic contraction of the muscles around the glottis.

\* \* \* \* \*

"A As far as I can tell by the information given to me by the question, the child was unable to draw air beyond the swollen glottis because of two factors. One, the glottis being swollen, that is the area, the opening almost entirely closed. And secondly, the existence of a mass of food material on the above side of that opening. It would be preventing air from going into the windpipe."

According to Dr. Grossman, the digestive fluids are acid and when the latter comes in contact with the glottis it causes it to close. Such was the defendant's explanation for the asphyxiation.

The following is taken from Dr. Grossman's cross-examination:

"Q  Now, in death doesn't the mouth drop open?

"A  It frequently does.

"Q  It usually does, doesn't it, Doctor?

"A  I would say it usually does, yes.

"Q  And if that mouth dropped open, the vomitus in that mouth would come out, would it not, Doctor?

"A  Not necessarily.

\*   \*   \*   \*   \*

"Q  Doctor, if I have a mouth full of water or liquid and I open my mouth, do I understand you to say that that would remain in my mouth in death?

"A  No, you did not understand me to say that. I did not talk about liquids or water which would obviously run out if you were hanging upside down with your head down. The water would obviously run out.

\*   \*   \*   \*   \*

"Q  Well, now, Doctor, if an object was held over the mouth and nose, that would keep the vomitus in, wouldn't it?

"A  I presume it would.

"Q  And that would also cut off the oxygen, wouldn't it?

"A  I presume that if an object did occlude the airway, the oxygen in the air would be cut off.

"Q  And if that object were there blocking the air passage, would that not cause regurgitation?

"A  Blocking of the air passage in that fashion might cause regurgitation as soon as the subject or the person became semi-conscious.

"Q  Then, that would also cause the blocking of the glottis, would it not?

"A  If the acid content—if the acid contents of the stomach are irritating enough to the structures around the glottis, which is the opening—the glottis itself is the actual space, then there would be a

spastic constriction of those structures causing an occlusion or shutting off of the space.

"Q Now, then, if the autopsy would show that the lungs were ballooned and a lack of oxygen in the system caused the death, that would indicate they were not getting any air, would it not?

"A That is correct."

The above suffices as a narrative of the evidence governing the first assignment of error. We have omitted mention of many witnesses and details.

The defendant argues that the explanation for the death which her witnesses offered is at least as reasonable as that given by the state's witnesses and that, therefore, the state has not discharged the burden of proof. For the reasons which follow, we believe that the jury could reasonably have found that the explanation given by the state's witnesses was more acceptable than that which came from the defendant: (1) Dr. Livingston could not say that the hematoma indicated a blow to the head sufficiently severe to have caused unconsciousness; (2) there was no evidence that the child drowned in its own fluids, which, according to Dr. Richardson, is generally the manner of death when a blow to the head has caused unconsciousness succeeded by regurgitation; (3) the defendant's witnesses did not account for the discoloration upon the cheeks, under the chin and across the nose. In making that statement we have not overlooked the defendant's contentions that Dr. Richardson did not make a microscopic examination for the purpose of determining whether the discolorations may have occurred after death. We think, however, that the jury could reasonably have found that the discolorations occurred prior to death. (4) Dr. Grossman acknowledged that upon death the mouth generally drops open and that thereby the contents of the mouth flow

out. No explanation was given as to how it happened that the vomitus remained in Sherry's mouth if a blow to the head rendered her unconscious and induced regurgitation.

From the foregoing we see that the defendant and Sherry were together in the period which is vital, 3:00 to about 5:45 p. m., January 23. Possibly we can determine the hour when death struck. As we have noticed, the defendant, at 5:40 p. m. told two police officers, who called upon her pursuant to the radio message, that Sherry had disappeared about 15 minutes previously. In the typewritten statement which the defendant signed she acknowledged that it was she who had summoned police aid. If her explanations in regard to time are accepted as truthful, the death occurred not later than 5:25 p. m. Since it was necessary for her to have made the round trip between her home and the sump, death must have occurred much earlier than 5:25. From 3:00 to 5:40 p. m. only four persons, so far as the record discloses, were in Sherry's presence—the defendant, Mr. Sing, Vickie and the taxicab driver. We shall now determine whether the jury could reasonably have believed that any one of the last three caused the death. Sherry was alive when the driver departed, and no one contends that he returned or committed the crime. If the jury accepted Dr. Richardson's explanation of the manner in which the asphyxiation was effected, they could not reasonably have believed that it was the hand of Vicki, a four-year-old child, which clamped itself for five minutes over the cheeks, nose, mouth and chin of the deceased, bruised those areas and shut off the air passages. Sing left his home shortly after 3:15 p. m. while Sherry was still alive and did not return until 6:00 p. m. when he and the defendant's mother entered the house.

Hence, if Dr. Richardson's theory was accepted by the jury, the defendant was the only person present at the vital period who could have committed the felonious act. It will be recalled that shortly after the defendant signed her statement she told the police officers that it was not Vickie, but Sing, who caused the death. In attributing guilt to Sing, the defendant stated that she knelt down alongside Sherry's inert body and discovered the absence of breathing. According to further statements which she then made, she put Sherry's boots and mittens upon the lifeless limbs and saw Sing depart as he went out to discard the body. That explanation, of course, indicated that the defendant was present when death struck. Accordingly, the jury was warranted in finding that the defendant was with her child at the crucial moment. When the police officers called at about 5:40 p. m. and when, a few minutes later, the Sings came home, it was noticed that the defendant's and Vickie's hair was wet and that they showed other signs of having been out in the weather. Those circumstances could have been accepted by the jury as proof that the defendant had just returned from her grim mission. The defendant's own declarations acknowledged that it was her hands which cast the lifeless body into the sump. When the defendant took the officers to the sump, the cover over the latter was in place and had to be removed before the body could be seen.

The above makes it clear that the jury was justified in finding that the defendant was present when death struck and that it was she who disposed of the remains.

The defendant gave various explanations as to the manner in which her daughter came to her death. Since she was present, she had firsthand information upon

the subject. Let us consider the explanation given in the typewritten statement. It says that Sherry "got hit by the soldier" in the basement of the home. "Soldier" was a game which the two children had occasionally played. By making that statement and others in similar vein, the defendant evidently wished to create the impression that while the children were playing soldier Vickie struck Sherry on the head and thereby caused the death. It is clear that when Sherry's body was recovered from the sump, the nose and mouth were filled with vomitus. The defendant's medical experts, as we have seen, testified that when a child is rendered unconscious by a blow to the head regurgitation generally occurs. In the typewritten statement, as well as in her oral declarations, the defendant never mentioned vomitus. If Sherry suffered a fatal blow to her head while playing in the basement and if death occurred in the manner suggested by the defendant's expert witnesses, and not in the way described by Dr. Richardson, regurgitation must have occurred in the basement. Otherwise we have no explanation for the vomitus which filled the mouth and nose of the corpse. If Sherry became unconscious in the basement and if regurgitation there occurred, no one has explained how the vomitus remained in the mouth and nasal passages. It will be recalled that the defendant claims that after she discovered that Sherry was dead she rolled her body down the stairs five times. Dr. Grossman swore that when death occurs the mouth generally falls open. According to other statements which the defendant made, she picked up Sherry's lifeless body after she had rolled it down the stairs, flung it over her shoulder and carried it to the distant gas company plant. No explanation has been ventured as to how the vomitus could have remained in the

mouth and nose of the child while that course was being pursued.

Without resort to further analysis, we express the belief that the jury could reasonably have found that the defendant's statements, whether they attributed guilt to Vickie or to Sing, were virtually refuted by parts of the testimony of her own three medical experts.

The circumstances so far reviewed could reasonably have persuaded the jury to believe that (1) death did not come in the way suggested by the defendant's three medical experts; (2) Sherry's life was taken in the manner which Dr. Richardson explained; (3) the defendant cast the corpse into the covered sump for the purpose of concealing evidence of a crime. But the evidence so far analyzed does not single out the defendant's hand and identify it as the one which snuffed out her daughter's life. We shall now analyze another segment of the evidence.

There is a material difference between the guilty and the innocent when a crime has been committed in secrecy. The innocent have no consciousness of guilt and have nothing to conceal. The perpetrator of the crime, upon the other hand, generally has a consciousness of guilt and is in possession of information which he knows the law enforcement agencies seek. He holds a secret which he must guard, for if he divulges an inkling of it the consequences to him will be grievous. His consciousness of guilt engenders fear of apprehension and of the consequences which will ensue if his guilt is discovered. A consciousness of that kind influences conduct as surely as does any other motivating force. One with a consciousness of guilt who wishes to escape detection must become an actor and endeavor to play the part of the innocent. If he cannot successfully play the part, he may create suspicion by

speaking when the innocent would have remained silent, or he may maintain silence when the innocent would have spoken. In lieu of trying to play the difficult character of the innocent, the guilty may resort to flight or even to suicide. Or he may accompany his efforts at essaying the role of the innocent by giving false explanations or the destruction, concealment and fabrication of evidence.

Let us now see whether or not the defendant's conduct, as revealed by the evidence which we have reviewed, manifested upon her part a consciousness of guilt. She evidently chose the dark, deep, covered sump as Sherry's humble sepulcher out of a belief that if her daughter's body was cast into it discovery would be unlikely. Thus, at the very outset, she resorted to the concealment of evidence. She must have known when she cast the body into that place that if it ever was discovered, and if the fact came to light that she was the person who had thrown it there, a surmise would arise that she took the course in order to dissemble a homicide and the manner in which it had been effected. After she had disposed of the body, the defendant manifestly convinced herself that she would be called upon by someone to account for Sherry's absence. The course which she chose to fend off inquiries was to undertake to deceive the police and all others into a belief that a kidnaping had occurred and that Sherry was in the possession of "an old gray-haired man." If the deception proved successful, a search would be made for the purported kidnaper and not for the body. In order to render her deceit more effective, the defendant enlisted the aid of Vickie and coached the little girl into the part which she was expected to play. When the defendant saw that the police officers accepted as truthful her

falsehoods, she ventured to play still further the part of the innocent and so she accompanied the officers while they searched the neighborhood for Sherry, although she knew that the search was in vain. At the outset, as we have seen, she sought to fasten guilt upon the anonymous old gray-haired man. A few hours after the defendant had summoned the police, a development, which she deemed fortuitous, occurred. The officers asked her for the name of the children's father and when she gave the information she discovered that they might be willing to believe that the father and his sister had taken the child. Thereupon she summoned to her aid further deception. Although she knew that Sherry was dead, she encouraged the officers to extend their search into distant cities for Mr. Dollarhide and his sister. The search soon located the Dollarhides, and when that fact was reported to the defendant she tried to play further the part of the innocent. She inquired whether the Dollarhides had her child. In the meantime, the officers, with the defendant's support, were tracking down gray-haired men and persons who in recent months had molested children. Possibly when the defendant sent for the police she did not perceive the problems which would confront her. Officers, both municipal and federal, came in relays and the different groups asked her questions. They even sought to elicit information from Vickie whom she had coached to give a false account of Sherry's disappearance. When the defendant observed that the officers were winning Vickie's friendship, she became distrustful of the ability of her little daughter to play a false role. She thereupon reproached the officers and told Vickie to stay away from them. In that way she resorted to suppression of evidence. Before long the defendant inferred that

the officers were manifesting misgivings about the story which she had told them. Next, two of the officers decided to become her accusers. It was at this point that she led a detail of the police to Sherry's dank vault. At that juncture a new explanation was put forth and this time the defendant lay the death at the feet of Vickie. When the officers disbelieved the new story and protested that the defendant could not have carried the body from her basement to the gas company's plant, still another story came forth. This time the defendant accused her stepfather of Sherry's death and claimed that it was he who disposed of the body.

From the above circumstances we see that the jury could have believed that the defendant, in trying to guard her secret, found it necessary to employ deceit and to resort, not only to the fabrication of evidence, but also to its suppression. Her conduct betokened a consciousness of her own guilt and pointed to her as the one who had shut off the air passages of Sherry, thereby asphyxiating the little girl. The contention, obliquely advanced, that the defendant adopted her course for the purpose of shielding Vickie clearly was not accepted by the jury. The latter had good reason for rejecting that contention. First, as we have seen, the tiny hand of Vickie could not have committed the crime. Next, after the defendant had signed the statement upon which the contention is based, she repudiated the accusation and turned upon Sing.

■ The defendant recognizes that evidence showing consciousness of guilt is admissible in cases of this kind. The rule is stated and copiously illustrated in Wigmore on Evidence, 3d ed, §§ 273 through 293. Examples of its application in this state are *State v. Hansen,* 195 Or 169, 244 P2d 990; *State v. Broadhurst,*

184 Or 178, 196 P2d 407; *State v. Henderson,* 182 Or 147, 184 P2d 392; *State v. Clark,* 99 Or 629, 196 P 360; and *State v. Zullig,* 97 Or 427, 190 P 580.

The person who committed a crime usually knows the exact manner in which he perpetrated it. Therefore, when he manifests a sense of guilt in the days which follow the commission of his crime, his self-condemning behavior betrays the manner in which he committed the misdeed. From the fact that he displays a sense of guilt, the jury may reasonably infer that he is guilty. Wigmore on Evidence, 3d ed, § 173. And if the manner in which the crime was committed is known, his sense of guilt, when established, warrants a belief that he committed the crime in that manner. When, as in the present case, evidence shows that (1) the death was effected by the hand of some person which shut off the air passages, (2) the defendant was present when death occurred, and (3) immediately after the death the defendant manifested a consciousness of guilt, the jury was authorized to reason that it was the defendant's hand which asphyxiated her daughter.

We are in accord with the defendant's contentions that when the state depends upon circumstantial evidence, the latter must be satisfactory and inconsistent with any reasonable theory of innocense. We are satisfied that the evidence in this case meets that standard. The jury was not bound to accept as true any exculpatory matter contained in the statement which the defendant signed and which is quoted in a preceding paragraph. *State v. Monk,* 199 Or 165, 260 P2d 474, and *State v. Ausplund,* 86 Or 121, 167 P 1019. According to our belief, the jury was warranted in concluding that the hand of the defendant closed tightly Sherry's air passages until the little girl was asphyxiated. The first assignment of error lacks merit.

■ Before considering the second assignment of error we shall move on to the third which attacks an instruction which was given to the jury upon the subject of consciousness of guilt. The exception which the defendant took to the instruction is manifested by the record in this way:

> "And one other exception: The Defendant also excepts to the Court's giving State's requested instruction No. 1 which was the consciousness of guilt instruction. The Court: 'You may have an exception to that, too.'"

In challenging the instruction, the defendant's brief says:

> "In the first place it is an unwarranted comment by the court upon the value and effect of certain evidence which is expressly prohibited by statute. Secondly, it is grossly unfair to defendant in failing to call the jury's attention to circumstances which would tend to minimize or explain the inculpatory effect of the alleged 'unusual and extraordinary actions', 'unnatural and abnormal conduct', and 'unreasonable and improbable explanations.' The instruction is also erroneous in that the assumption that such conduct or statements tend to prove a 'consciousness of guilt' is faulty and is not the law."

This court has many times held that an exception such as that which the defendant saved by the quoted words is insufficient. In *Smith v. Pacific Northwest Public Service Company*, 146 Or 422, 29 P2d 819, it is said:

> "* * * There is a fundamental difference between the giving of instructions to a jury and the refusal to give instructions. In one case the court acts affirmatively and if it is in error then attention should be called to such error in order that it may be corrected. In the other case the court has

before it a requested instruction which speaks for itself and after considering the same refuses to give that instruction and the requesting party cannot be held to be bound to then and there advance every meritorious theory and submit every authority which might tend to show the instruction a proper one.''

A recent holding to similar effect is *Garrett v. Eugene Medical Center,* 190 Or 117, 224 P2d 563. In *Wilson v. State Industrial Accident Commission,* 189 Or 114, 219 P2d 138, the decision of this court, written by the Chief Justice, said:

''The third point raised by defendant is that the court erred in instructing the jury '* * * that the testimony of experts is to be received and considered with narrow scrutiny and with much caution.' The exception taken at the trial is as follows: 'I wish to add a further exception to your Honor's ruling as to expert witnesses, because that was not called for, there was an expert witness on both sides.' It has been held by this court many times that to enable one to take advantage of error in the giving of instructions, the party must point out specifically the grounds of his exception. Had defendant in this case excepted to such instruction on the ground that the court was invading the province of the jury, since the credibility of witnesses is exclusively a jury question, such an exception would have been well taken. The trial court has no business commenting on the evidence, and we disapprove of such practices; however, the exception taken was not sufficient to call to the court's attention the point now raised.''

*State v. Johnston,* 143 Or 395, 22 P2d 879, which was based upon a charge of embezzlement, says:

''It should be unnecessary to repeal that it is only error properly excepted to that will be re-

viewed upon appeal. It is the duty of counsel, when excepting to instructions given, to point out to the court in what respect the instruction excepted to is erroneous. 16 C. J. 1072; Hooton v. Jarman Chev. Co., 135 Or. 269 (293 P. 604, 296 P. 36) ; La Grande National Bank v. Crum, 139 Or. 530 (11 P. (2d) 553)."

In that case,. this court held that an exception which challenged an instruction as "against the law" was insufficient. See, to the same effect, *State v. Poole,* 161 Or 481, 90 P2d 472.

■ Notwithstanding the insufficiency of the defendant's exception, we gave careful attention to the challenged instruction. Although we do not believe that the instruction is entirely perfect, yet it is not subject to the attack made upon it by the defendant. We dismiss this assignment of error as. without merit.

■ The second assignment of error follows:

"The court erred in failing to give the following instruction requested by the defendant to which exception was taken. 'I instruct you that the Oregon Laws defines excusable homicide as follows:' "

At that point the requested instruction incorporated within itself the exact phraseology of § 23-418, OCLA.

In support of the assignment of error, the defendant's brief says:

"The court's failure to give an instruction on defendant's theory that if homicide was committed by the defendant that it was excusable constitutes reversible error."

Although the record indicates that Sherry's death resulted from homicide, we have been unable to find anything therein which could have warranted the submission of instructions upon the subject of excusable

homicide. The decisions cited by the defendant do not hold that a trial judge must instruct upon excusable homicide, even in the absence of evidence indicating that the homicide was justifiable. In *State v. Way,* 120 Or 134, 249 P 1045, 251 P 761, which was reversed on the ground that the trial judge erroneously failed to instruct on excusable homicide, this court carefully pointed out that the record contained evidence capable of a reasonable belief that the defendant struck the fatal blow in self-defense. *State v. Trent,* 122 Or 444, 252 P 975, 259 P 893, held that, since the evidence did not suggest a defense of justifiable homicide, the trial judge properly declined to instruct upon the subject. We find no merit in this assignment of error.

The fourth assignment of error reads as follows:

"The court erred in failing to sustain the defendant's objection to the following question put to Dr. H. L. Richardson on direct examination:

" 'Q Now, Doctor, taking into consideration the bluish bruises testified to by you about the chin and both cheeks—wait a minute, about both cheeks and under the chin of the body of little Sherry, and their nature and the evidence of the simultaneous blockage of the air passages through the mouth and nose, and the contour of the said bruises upon the face and chin, do you have an opinion as to whether or not these bruises were caused by a human hand or hands?

\* \* \*

" 'A Yes.
" 'Q And what is that opinion?

\* \* \*

" 'A My opinion is that the markings are similar to those made or could be made by a hand.' "

Dr. Richardson, who expressed the challenged opinion, has had extensive experience in performing au-

topsies and in making examinations for the purpose of determining, if possible, the means whereby death in homicide cases was effected. Before he expressed the above-quoted opinion he had described the manner in which he had performed the autopsy and the detailed examination which he had made of the bruises and discolorations.

The defendant claims that the subject matter of Dr. Richardson's opinion is not within the area of expert opinion and that a jury was as capable of forming a correct opinion upon the subject as he. Therefore, according to the defendant, Dr. Richardson's opinion was inadmissible and, since his challenged testimony was upon a vital issue, the error is reversible.

The cases cited by the defendant do not support her contentions. In *State v. Barrett,* 33 Or 194, 54 P 807, a police officer testified that, in his opinion, a body had been moved from the position and place where it fell after being shot. This court pointed out that the witness was not an expert on the subject of how men fall when they are shot, and indicated doubt whether the matter was a proper subject for expert testimony. In *State v. Jennings,* 48 Or 483, 87 P 524, 89 P 421, a witness gave his opinion as to the direction from which a bullet had been fired. The opinion was based upon the witness's inspection of the blood which was splattered around the corner of the room where the deceased was shot. The witness was not qualified as an expert. The record was silent as to the position of the body and the location of the blood stains. *State v. Morris,* 83 Or 429, 163 P 567, involved the testimony by a physician that the choking of the victim could not have been accidental. This was held not to be reversible error because, under the circumstances of that case,

the jury could not have reached a different result. It is worthy of note that the objection was made, not to his opinion that the marks on the deceased's throat were finger marks, but that the strangulation was not accidental.

The question submitted to Dr. Richardson in this case is clearly distinguishable from the subjects of inquiry in the cited cases. We think that the causes of discolorations on a human body are not a matter of such common knowledge that a jury can correctly ascertain their probable cause. The character of the discoloration is a matter of expert knowledge. It might be a bruise, a broken blood vessel or post-mortem lividity. If it is determined to be a bruise, the nature of the force and instrument causing it is by no means self-evident. It may have been caused by a fist, the palm of the hand, a sharp instrument, a blunt instrument, something with a pliable surface or an instrument with a hard, jagged edge. Involved in the inquiry is something more than the symmetry of the markings. Anyone who undertook to answer the question submitted to Dr. Richardson would have to be able to determine the amount of force which was exerted. In the present instance, the amount of force was indicated to some extent by the ballooned lungs and the condition of the heart. We cannot say that the cause of a bruise is as well known to laymen as to an expert. It is our belief that a physician of the competence of Dr. Richardson, and who had conducted an intensive investigation for the purpose of ascertaining the manner in which death was caused, was qualified to answer the question propounded to him. *Goldfoot v. Lofgren*, 135 Or 533, 296 P 843; *State v. McDaniel*, 39 Or 161, 65 P 520; *State v. Barton*, 5 Wash 2d 234, 105

P2d 63. We dismiss the fourth assignment of error as without merit.

■ The fifth assignment of error charges as follows:

"The court erred in refusing to permit defendant to require P. E. Lippold to produce notes which he used to refresh his memory."

Preceding paragraphs of this opinion review Mr. Lippold's testimony. He was the second of the many police officers who testified. While upon the witness stand he used no notes, but upon cross-examination it developed that "within the last couple of days" he had consulted notes which he had made. He explained, "There's some details I wanted to check on." The examination presently continued:

"Q Officer, after—you have read your notes. Do you, did you have and do you now have an independent recollection of which you have testified here?

"A Yes, I have."

The testimony given by Lippold was only corroborative of that given by other officers who also testified without notes. They were not asked whether they possessed any notes or had refreshed their recollections.

In support of this assignment of error, the defendant depends in part upon § 4-707, OCLA (ORS 45.580), which says:

"A witness is allowed to refresh his memory respecting a fact by anything written by himself, or under his direction, at the time when the fact occurred or immediately thereafter or at any other time when the fact was fresh in his memory * * *; but in either case the writing must be produced, * * *."

The defendant concedes that the decisions of this court are adverse to her contention. *State v. Magers,* 36 Or 38, 58 P 892, and *State v. Yee Guck,* 99 Or 231, 195 P 363, held that a witness, who possesses an independent recollection of the events, cannot be required to produce a writing which he used to refresh his memory before entering the witness stand. It is advisable to take note of the fact that in those two cases, as in the one at bar, the witnesses had an independent recollection. Those two cases, therefore, were not concerned with records of past recollections. Wigmore on Evidence, 3d ed, § 762, note 4; see, also, 18 Or L Rev 136, which argues that § 4-707, OCLA, fails to distinguish between ''past recollection recorded'' and ''present recollection revived.''

The brief filed by the defendant calls our attention to Wigmore on Evidence, 3d ed, § 762, where it is stated:

''The rule should apply, moreover, to a memorandum *consulted* for refreshment *before trial* and not brought by the witness into court; for, though there is no objection to a memory being thus stimulated, yet the risk of imposition and the need of safeguard is just as great. It is simple and feasible enough for the Court to require that the paper be sent for and exhibited before the end of the trial.''

A footnote, at page 315 of Deady, General Laws of Oregon, 1845-1864, says:

''The rules and principles of the law of evidence as embodied and codified in this and the following two chapters, are mainly condensed and extracted from Greenleaf's Treatise on the Law of Evidence.''

*State v. Magers,* supra, and *State v. Yee Guck,* supra, in reaching their conclusions, quoted extensively from

Greenleaf, the very fountainhead of § 4-707, OCLA, and then interpreted the latter in harmony with the rule espoused by Greenleaf. In view of that fact, we do not believe that we are at liberty to adopt the point of view advocated by Wigmore, although if we had the rule-making power we would find it hard to resist the merits of the rule which he advocates. Possibly those who have the rule-making power will consider Wigmore's suggestion. We find no merit in the fifth assignment of error.

The above disposes of all the contentions advanced by the defendant. Although we have considered all of the assignments of error, we have found no merit in any of them.. The trial judge bestowed painstaking care upon every contention which the defendant presented. She had a fair trial and it was free from error. The judgment of the circuit court is affirmed.