Argued and submitted November 26, 2014, affirmed July 27, petition for review denied December 8, 2016 (360 Or 697)

## STATE OF OREGON,
*Plaintiff-Respondent,*

*v.*

## WILLIAM FRANK SIMMONS,
*Defendant-Appellant.*

Jackson County Circuit Court
101469FE; A151636

379 P3d 580

Erica Herb, Deputy Public Defender, argued the cause for appellant. With her on the brief was Peter Gartlan, Chief Defender, Office of Public Defense Services.

Rolf C. Moan, Assistant Attorney General, argued the cause for respondent. With him on the brief were Ellen F. Rosenblum, Attorney General, and Anna M. Joyce, Solicitor General.

Before Hadlock, Chief Judge, and Armstrong, Ortega, Sercombe, Duncan, Egan, DeVore, Tookey, Garrett, Flynn, DeHoog, Shorr, Judges, and Edmonds, Senior Judge.

## EDMONDS, S. J.

Defendant appeals a judgment of conviction for the lesser included offense of first-degree manslaughter, ORS 163.118(1)(a), after a jury trial.[1] On appeal, he assigns as error the denial of his motions for a judgment of acquittal. We affirm.

Defendant was indicted in 2010. The 15-year-old victim disappeared during the evening of November 6, 1996, in rural Jackson County, after being last seen on that date with defendant at his trailer where he lived at the time. The remains of the victim's body were found in April 2008, in a field approximately 80 feet from the trailer. Defendant was convicted on the basis of circumstantial evidence.

Defendant argues on appeal that the trial court erred in denying his motions because, in his view, the evidence was legally insufficient to submit the question of whether he caused the death of the victim to the jury. In response to defendant's argument, the state first argues that defendant failed to preserve his claim of error on appeal, as ORAP 5.45(1) requires. In the state's view, defendant's motions for a judgment of acquittal in the trial court were too general in content to satisfy the requirement of that rule. The test under the rule is whether defendant provided to the trial court an explanation that was specific enough to ensure that the court could have identified the claim of error that defendant now identifies on appeal. *State v. Wyatt*, 331 Or 335, 343, 15 P3d 22 (2000).

After the state closed its case-in-chief, defendant moved for a judgment of acquittal, arguing as follows:

"[DEFENDANT]: The State has rested their case, at this time, the Defense would move for a judgment of acquittal on the basis there's been insufficient evidence for the jury to be able to reach a verdict of guilty.

"* * * * *

---

[1] ORS 163.118(1)(a) provides that "criminal homicide constitutes manslaughter in the first degree when (a) it is committed recklessly under circumstances manifesting extreme indifference to the value of human life[.]" Defendant was charged under ORS 163.115 with intentionally causing the death of the victim.

"[THE STATE]: [T]his is a matter for the jury. The issues are to be viewed in the light most favorable to the State. If the Court wants me to make extensive argument I will, but—

"THE COURT: No.

"[THE STATE]: —it's clearly a jury question.

"THE COURT: Yeah, I'm going to deny the motion. This is a matter for the jury. There are facts at issue and there is—viewing the case in the light most favorable to the State there is evidence to go to the jury."

After defendant presented his case to the jury, he renewed his motion for a judgment of acquittal:

"[DEFENDANT]: "[A]t this time we would re-raise our motion for judgment of acquittal. The State does not have adequate evidence, even taken in the light most favorable to the State that any reasonable jury could find [defendant] guilty.

"THE COURT: All right. I believe viewing the evidence in the light most favorable there is adequate evidence to submit the case to the jury.

"So, I'm going to deny the motion for judgment of acquittal."

The only contested element of the charge at trial was the allegation that defendant had caused the death of the victim. In that context, defendant's motions put the trial court and the state on notice that he was contesting the legal sufficiency of the evidence regarding the issue of causation. Defense counsel's statements regarding "insufficient" and the lack of "adequate" evidence could have had no other meaning to the trial court. It follows that defendant's claim of error on appeal is adequately preserved under the rule.

We turn to the merits of defendant's claim of error. Review in this case is governed by the standard of review that applies in a criminal case after a motion for judgment of acquittal is made and denied by a trial court. As such,

"the relevant question is whether, after viewing the evidence in the light most favorable to the state, any rational

trier of fact could have found the essential elements of the crime beyond a reasonable doubt.[2] It is not proper for [a reviewing court] to hold that there is a reasonable doubt because of conflicts in the evidence. After a verdict of guilty, such conflicts must be treated as if they had been decided in the state's favor. After the conflicts have been so decided, [a reviewing court] must take such decided facts together with those facts about which there is no conflict and determine whether the inferences that may be drawn from them are sufficient to allow the jury to find defendant's guilt beyond a reasonable doubt. [A reviewing court's] decision is not whether [it] believe[s] defendant is guilty beyond a reasonable doubt, but whether the evidence is sufficient for a jury so to find."

*State v. King*, 307 Or 332, 339, 768 P2d 391 (1989) (internal citations omitted).

Under the above rule, a trial court, when faced with a motion for a judgment of acquittal, must consider two categories of facts. The first category concerns facts that are in dispute. The above rule requires that the disputed facts be viewed in the light most favorable to the state for purposes of deciding the motion, and it entitles the state to any favorable, reasonable inferences that can be drawn from the facts viewed in that light. The second category concerns undisputed facts. In deciding a motion for a judgment of acquittal, a trial court must also consider all reasonable inferences of guilt and innocence arising from the undisputed facts. The final step of the analysis in deciding the motion is to inquire whether "any" rational juror could find a defendant guilty

---

[2] The import of the word "any" in the phrase "any rational juror" means that for the trial court to properly grant a motion for a judgment of acquittal, it must conclude that no rational juror could find the defendant guilty based on the disputed facts viewed in the light most favorable to the state together with the undisputed facts. The test of "any rational juror" reflects a policy that delegates fact finding and resultant verdicts in a criminal case to a jury of peers and reserves questions of law to courts. Although the difference between questions of fact and law in the application of the "any rational juror" standard may be imprecise, it is a necessary part of a "line-drawing" exercise which favors the constitutional policy that criminal cases will be decided by juries except when the state fails to carry its burden of persuasion of proving a *prima facie* case. The standard satisfies constitutional requirements for appellate review of criminal convictions. *State v. Walton*, 311 Or 223, 242, 809 P2d 81 (1991) (noting that the Oregon standard is identical to the standard approved in *Jackson v. Virginia*, 443 US 307, 319, 99 S Ct 2781, 61 L Ed 2d 560 (1979)).

of the essential elements of the crime beyond a reasonable doubt based on the consideration of facts and reasonable inferences arising from both categories of evidence.

Applying the above rule, we turn first to the undisputed facts and the disputed facts as viewed in the light most favorable to the state. On the evening of November 6, 1996, the victim's family attended church services. The church was close enough to the family's residence that the victim would walk to church when the weather permitted. The victim left her residence around 6:15 p.m. with the announced attention of meeting a girlfriend at the church. After the services ended, the victim's mother waited for the victim in the church lobby. When the victim did not appear, the mother went to the family residence believing that the victim had walked home from church. When she arrived at her residence, the victim was not there. Shortly after 9:00 p.m., the mother called the church and asked that the church grounds be searched. When the victim was not found, law enforcement officials were notified of her disappearance around 11:00 p.m.

Defendant and his parents also lived within walking distance of the church. Defendant lived in a separate trailer on the premises from where his parents lived. The ensuing investigation ascertained that the victim never went to the church that night. Instead, she walked to defendant's trailer between 6:45 and 7:00 p.m. The victim had made prior arrangements to meet her boyfriend at defendant's trailer. However, the boyfriend decided not to go to defendant's trailer to avoid trouble with his stepfather, without informing the victim. As a result, defendant was alone with the victim on the evening of November 6, 1996, in the hours preceding her disappearance.

Defendant's mother arrived home at approximately 7:30 p.m. The victim may have stuck her head out of defendant's trailer to say "hi." Also, a friend of defendant's stopped by and talked with defendant and the victim outside the trailer for approximately 15 minutes while the victim was at the trailer. According to defendant, he and the victim watched part of a movie together, and the victim left his trailer thereafter, intending to walk to the church before

the services were over to meet her mother. The resulting investigation of the victim's disappearance showed that defendant was the last person known to the police to have seen the victim alive, and consequently, he was interviewed extensively by investigators during the years that followed. Also, extensive and multiple searches of the premises where defendant's trailer was located occurred in the time following her disappearance, including searches by dog teams.

In 2008, the victim's remains were discovered in a field of three-foot-high grass approximately 80 feet from defendant's trailer, the place where she was last observed by others to be alive. The remains were not buried, but were found in a depression in the surface of the field. The field bordered the property on which defendant had lived in 1996. At the time and thereafter, the owner of the field customarily avoided the field because he did not get along with defendant's family and because he did not maintain it. According to investigators, the position of the victim's clothing found on her remains indicated that she had been dragged by her feet to the location where her remains were found. At the time of her disappearance, the victim weighed 120 pounds and could have been dragged to that location by a single person. At the time of the victim's disappearance, defendant had no driver's license or access to a car, which could have permitted him to move her body to another location. According to expert testimony, the remains had been decomposing for a significant period of time at the location where they were found, and the remains had been at that location for at least five years before they were discovered in 2008.

The remains of the victim's head and neck were found wrapped in a minimum of eight feet of duct tape. A photograph of defendant's trailer as it existed at the time of the disappearance displayed a piece of duct tape. There was also evidence at trial that a wall in defendant's trailer had been sanded within a month after the investigation into the victim's disappearance had begun.

The investigation showed that defendant thought that the victim was attractive. He told investigators that he may have confided to his friends that he had a crush on her. Also, defendant believed that the victim's boyfriend intended

to break up with her because the victim refused to have sex with him. The victim had vowed to remain chaste until marriage and wore a promise ring to signify that intention.

The medical experts could not conclude, with any certainty, what means caused the death of the victim. The possible causes of death included suffocation, severe blunt trauma, or stabbing. Ultimately, the deputy state medical examiner concluded that her death was caused by "homicidal violence of undetermined type." One examiner discovered sharp, forced trauma to one of the victim's ribs and opined that a knife less than nine inches long could have caused the injury. There is also expert testimony in the record that a defect in the underwire of the victim's bra could indicate a glancing or grazing knife cut and that the trauma to the victim's rib most likely came from a manmade object, such as a sharp knife. The medical examiner also testified that a stab wound to the chest could result in pooling of blood in the chest cavity and would not be, at least initially, as evident externally as it would be internally.

At trial, the state produced evidence that defendant possessed multiple knives and machetes at the time of the victim's disappearance, including a "big knife * * * with a curved blade" and a "long knife * * * that lock bladed and * * * would open up." Defendant's uncle described defendant as a "knife freak."

As part of its investigation, the police searched for blood stains within the trailer, but were unable to discover any evidence of human blood. Defendant explained that he sanded the trailer wall to "clean off the dirt * * * and the scars from * * * the wall," but conceded that all of the walls needed sanding and that he had stopped sanding after completing the sanding of only one wall.

A rational factfinder could infer that defendant gave inconsistent statements to police regarding the last time he saw the victim. Initially, defendant told police that he had "seen" the victim walking down the road toward the church after she left his trailer. Defendant also testified at trial that there was a porch light on at his trailer when the victim left. The evidence is undisputed that it would have been dark at the time. Subsequently, defendant told investigators in 2002

that he had "heard" the victim's footsteps as she walked in the direction of the church. Other members of defendant's family testified that there was no exterior lighting on defendant's trailer or in the area that would have permitted him to observe her walk down the road to the church on a dark night.

During the multiple interviews of defendant by investigators after the victim's disappearance, defendant never expressly admitted that he had caused the death of the victim. However, at one interview, when asked for information about the victim's disappearance, defendant bowed his head and said that "he just didn't know what to do." Subsequently, when asked to provide pertinent information to find her body, defendant said that "he would think about it." When asked what was preventing him from providing information, defendant said, "I don't know." Later, when asked why he could not tell investigators "what happened," defendant said, "I'm just not ready to." Defendant also said that he wished he "could do [the day the victim disappeared] over again," and that he did not "feel good" about "what happened to Kaelin."

In contrast to the above evidence favorable to the state, there are undisputed facts that give rise to an inference of innocence regarding the claim that defendant caused the death of the victim. After the victim's disappearance, the area around defendant's trailer was searched a number of times by law enforcement agencies, the victim's family, friends, and individuals associated with an organization that assists in the search for missing persons. The victim's remains were not discovered as a result of those efforts. About a month later, detectives searched defendant's trailer and his family's property with the consent of defendant and his family. A criminalist also conducted a search of defendant's trailer. The trailer was sealed, and its interior was sprayed with a chemical to detect blood stains, but no human blood samples were discovered. Approximately a year later, a detective returned and conducted another search, including having the septic tank on the property pumped. Also, the FBI conducted a search of the property including several searches by dog search teams. In 1999, a detective conducted a search of a utility trailer filled with trash on the

property. None of the searches resulted in the seizure of evidence connecting the victim to defendant.

Additionally, defendant was interviewed by police investigators on November 11, November 16, and December 6, 1996, regarding the details of the victim's visit to his residence. Between December 6, 1996, and January 29, 1997, defendant was interviewed eight more times by police. On March 17 and 18, 1998, defendant was again interviewed and became upset, telling the investigator that he had provided all details in the other interviews. The interviews by police investigators continued over the ensuing years. One FBI agent interviewed defendant a total of 13 times over the years that she worked on the case, including having defendant make a written statement to her. Defendant argues that the facts are undisputed that he gave the same description of events each time that he was interviewed.[3]

After consideration of the disputed and undisputed facts in the light most favorable to the state, as well as inferences of innocence that flow from the undisputed evidence, the second level of analysis inquires "whether, [as a matter of law,] a rational factfinder, drawing reasonable inferences and making reasonable credibility choices, could find the essential elements of the offense beyond a reasonable doubt." *State v. Guy*, 229 Or App 611, 617-18, 212 P3d 1265, *rev den*, 347 Or 259 (2009) (internal citation omitted). In answering that inquiry, the state is entitled to the benefit of the combined effect of reasonable inferences that can be drawn from the evidence, as distinguished from inferences based on speculation, including the stacking of speculative inferences. *State v. Bivins*, 191 Or App 460, 466-68, 83 P3d 379 (2004). The applicable legal test for the drawing of an inference is one of logical probability: Does the inference more likely than not flow from the facts as found? If the answer to

---

[3] There are both disputed and undisputed facts relevant to defendant's contention that his statements to police never changed. It is undisputed that he never expressly admitted causing the death of the victim. Whether he gave inconsistent statements regarding his observation of the victim leaving, whether the area was illuminated at the time she left, and whether he gave statements that evidence a consciousness of guilt is in dispute. Under the proper standard of review, those facts must be viewed in a light favorable to the state. Finally, if a factfinder could find that defendant was false in part of his statements, it is entitled to distrust all of his statements.

that inquiry is in the affirmative, the legal test for the use of an inference as evidence is satisfied. If the evidence is determined to be legally sufficient under these standards, then the weight to be given to the combined facts and inferences (for determining whether the state has carried its burden of persuasion beyond a reasonable doubt) is for the jury to decide. *Id.* at 466-68.

What follow are reasonable inferences and ultimate facts that *a* rational juror could draw from the above evidence.

1. Defendant had the opportunity to cause the victim's death. He was the only person observed to be with the victim within the hours that preceded her disappearance. Defendant admitted that he was with the victim within an hour of the time that she intended to be at the church, and it is undisputed that no one else saw her alive after she was observed to be with him at his trailer.

2. Defendant had easy access from his trailer, where the victim was last seen alive, to the location 80 feet away where the victim's remains were discovered. A rational factfinder could infer that the victim's 120-pound body could have easily been dragged by defendant to that location from defendant's trailer. There is a competing inference arising from the undisputed evidence that numerous searches of defendant's trailer and his property around the time of her disappearance did not result in the discovery of her body or the seizure of incriminating evidence, which leads to the ultimate conclusion that defendant did not cause the victim's death. As in any case involving competing reasonable inferences, what weight to give them presents a question of ultimate fact for factfinders to decide, so long as a rational factfinder could draw each inference.

3. Defendant was in a location where he had the physical ability to drag the body to the field in which it was concealed, and he had access to duct tape, which was used undisputedly to wrap the victim's body. Also, it is inferable that defendant was aware that the tall grass in the field next to his residence could conceal a body. Because defendant lived next to the field, a rational factfinder could infer that he knew that the field was not maintained and that

its owner did not frequent the area. Additionally, there is evidence that defendant sanded a single wall in his trailer about a month after the victim's disappearance, and it could be inferred from the fact that the wall was sanded that the intention was to conceal physical evidence from the victim's body. However, a competing inference arises from the undisputed fact of the delayed discovery of the victim's remains and that no human blood was found within the trailer. As is the case with other competing inferences in this case, each reasonable inference is properly considered along with the other evidence as a matter of the weight to be given to the evidence. The function of assigning weight to particular evidence is a jury function and not a function of the court in deciding a question of law. It follows from the combination of facts and inferences favorable to the state that it could be reasonably inferred that defendant possessed the knowledge and the means to conceal the victim's remains.

4.  Defendant told investigators about his romantic interest in the victim. The fact that the victim's boyfriend did not arrive at the trailer as the victim apparently contemplated is a relevant fact to the circumstances that existed at the trailer. From his statements that he viewed the victim to be attractive and from his interest in her declarations of chastity and her relationship with her boyfriend, a rational factfinder could infer that the victim would have rebuffed any uninvited sexual advances by defendant. Although it would be speculative to infer that what in fact thereafter occurred is that defendant caused the death of the victim after she rebuffed an advance from him, the undisputed evidence regarding his interest in her is a relevant circumstance regarding how each viewed their relationship and is part of the evidence favorable to the state.[4] Regardless, proof of motive is not essential to a conviction based on circumstantial evidence. *State v. Sack*, 210 Or 552, 556, 300 P2d 427 (1957).

---

[4] The ultimate inference that a rational trier of fact could find that defendant caused the death of the victim beyond a reasonable doubt is based on the combination of reasonable inferences that a rational trier of fact could draw and is not based on any single inference, including the existence of or lack of proof of motive.

5. It is undisputed that defendant had access to numerous knives and was a "knife freak." It is also reasonable to infer that the victim's death was caused by a wound that could have been inflicted by the kind of instrumentalities that defendant possessed. Viewed in the light most favorable to the state, a rational factfinder could infer that defendant possessed the means that could have caused the victim's death.

6. As to defendant's veracity, a rational factfinder could infer that defendant lied when he gave inconsistent statements to investigators regarding whether he observed or heard the victim go down the road towards the church, and whether at the time, the surrounding area was illuminated by a light on his trailer. Moreover, a rational factfinder would be entitled to infer that defendant lied in an attempt to create circumstances to support his testimony to cover up the event causing her death, particularly in light of the other incriminating statements that he gave investigators. Once again, whether an inconsistency in statements is "material" to the question of guilt is a question about the weight to be given to the purported inconsistency, and the issue of the "materiality" of evidence is an issue that lies within the exclusive province of the jury.

7. The above rationale applies to statements that evidence a consciousness of guilt. It is proper for a rational juror to infer in a homicide case that a declarant who makes statements evidencing a consciousness or sense of guilt is the person responsible for the death of the victim. *State v. Kader*, 201 Or 300, 333, 270 P2d 160 (1954). In this case, a rational juror could infer that defendant's statements to investigators acknowledged his knowledge of the circumstances of the victim's death, and that his refusal to divulge those circumstances manifested a consciousness of guilt. As the court stated in *King*, it is not legally correct for a court to rule that there is a reasonable doubt as to guilt merely because of conflicts in the evidence. That task is reserved solely for the jury under our constitutions and statutory framework for the adjudication of criminal cases.[5]

---

[5] "A party has the burden of persuasion as to each fact or nonexistence of which the law declares essential to the claim for relief *** that the party is

Based on the above evidence and the reasonable inferences that arise from both the disputed and the undisputed evidence, we hold that there was legally sufficient evidence in this case for the trial court to have properly submitted the case to the jury. A rational factfinder could find that the essential elements of the crime for which defendant was convicted had been proven beyond a reasonable doubt based on the above evidence. In the abstract, there are two potential reasons that could exist, either of which would have made it error to submit the case to the jury: either there are inferences of innocence that reasonably flow from the undisputed evidence that create by themselves a reasonable doubt as to defendant's guilt as a matter of law, or the evidence, both disputed and undisputed, is so lacking in proof so as to require the jury to speculate about defendant's guilt when viewed in the light most favorable to the state. Neither reason for taking the case away from the jury exists on this record. Viewing the evidence in the light most favorable to the state, defendant is the only known person who could have caused the death of the victim within the narrow time period between her disappearance and when she was last observed to be alive.

The dissent would hold that that "a jury was free to draw most of [the inferences favoring guilt], but that they are not sufficient to support a finding, beyond a reasonable doubt, that defendant caused the victim's death." 279 Or App at 770. The dissent's position relies primarily on what it considers to be a paucity of proof. Specifically, it points to a lack of defendant's DNA on the duct tape that was wrapped around the victim's remains when it was discovered, the failure to discover any human blood traces in defendant's

---

asserting." OEC 305. Here, the state had the burden of persuading the jury beyond a reasonable doubt that defendant caused the death of the victim.

"The burden of persuasion summarizes the obligation of a party to convince the trier of fact that the party's assertion about an essential fact is true. If that party does not establish the truth of that essential fact in the mind of the factfinder by the requisite standard of proof, then the fact finder cannot find that the fact exists."

*State v. James*, 339 Or 476, 486, 123 P3d 251 (2005) (internal citation omitted). A reviewing court does not decide on appeal whether the state has carried its burden of persuasion but whether any rational factfinder could so conclude based on the available evidence.

trailer, and the fact that the area in which the remains were found adjacent to defendant's trailer was searched on numerous occasions at the time of her disappearance. Additionally, the dissent focuses on evidence favorable to defendant in derogation of the principle that for purposes of determining whether a motion for a judgment of acquittal should have been granted, this court reviews the evidence in the light most favorable to the state. For example, with regard to defendant's inconsistent statements to investigators, the dissent asserts, "[p]erhaps a jury could infer that defendant knowingly altered his story many years later, but neither that possible inconsistency nor conflicting testimony about whether defendant's trailer had a porch light renders defendant's account so inconsistent and obviously fabricated for all the jury to infer that defendant lied[.]" 279 Or App at 775.

Certainly, a rational factfinder could infer from the evidence relied on by the dissent that the state had not carried its burden beyond a reasonable doubt, but a reasonable juror would not be required to do so. Rather, as a matter of law, those inferences merely compete with the contrary inferences of guilt and form the body of evidence that the jury was entitled to consider as a whole. The DNA evidence is illustrative of the point. No DNA from defendant was found on the duct tape wrapped around the victim's remains, but neither was there any DNA from the victim found on the duct tape. Thus, a rational factfinder could draw an inference of innocence as well as no inference whatsoever in assessing the weight to be given to the DNA evidence.

Contrary to the dissent's construct, the law imposes an objective standard on courts to assess whether there is evidence existing in the record that would permit *any* rational factfinder to find defendant guilty beyond a reasonable doubt when the evidence is viewed in the light most favorable to the prosecution. Indeed, the dissent's construct appears to beg that question because it places a reviewing appellate court into the posture of weighing the evidence. Nonetheless, the properly-framed question before us is whether any rational factfinder could find defendant guilty beyond a reasonable doubt, based on the evidentiary record before us, when viewed in the light most favorable to the state. We answer

that inquiry in the affirmative for the reasons explained above, and it follows that the trial court did not err in denying defendant's motions for a judgment of acquittal.

Affirmed.

**ORTEGA, J.,** dissenting.

The majority affirms the denial of defendant's motions for judgment of acquittal based on a series of inferences. A jury was free to draw most of those inferences, but they are not sufficient to support a finding, beyond a reasonable doubt, that defendant caused the victim's death. At most, the inferences the majority points to would allow a jury to conclude, beyond a reasonable doubt, that defendant *could have* caused the victim's death and that he knows things he is not saying about the events that led to her death—but those inferences are not enough, without resorting to speculation, to distinguish defendant from the universe of unknown persons who also could have caused the victim's death. Because the evidence and inferences in this case are not sufficient to support defendant's conviction for manslaughter in the first degree, I dissent.

At the outset, it is important to note the significance of the fact that defendant was convicted entirely on circumstantial evidence. There is no direct evidence that defendant caused the victim's death. As the Supreme Court acknowledged in *State v. Krummacher*, 269 Or 125, 139, 523 P2d 1009 (1974), in a circumstantial evidence case, "the inferences of innocence [must] be considered that may be drawn from the facts in evidence (as found in the [s]tate's favor) or from the paucity of such facts, and if they are sufficient to create a reasonable doubt, the case may not be submitted to the jury." It is in that light that I address below evidence that affords a basis for inferences of innocence to make the required legal determination of whether the disputed evidence viewed in the light most favorable to the state, along with the undisputed evidence, including evidence supporting inferences of innocence, is sufficient to create reasonable doubt.

Moreover, although the majority recognizes that the verdict may be upheld only if a reasonable jury could have found *beyond a reasonable doubt* that defendant caused the

victim's death, that concept has no content as applied by the majority. The inferences of guilt available from the undisputed evidence and the disputed evidence taken in the light most favorable to the state does not dispel reasonable doubt that defendant caused the victim's death; indeed, much of that same evidence could equally be used to support a theory that any number of unknown persons could have caused the victim's death. Moreover, the majority acknowledges some (though not all) of the inferences of innocence available from the evidence, but merely concludes that the jury could have rejected those, without really evaluating their effect on reasonable doubt. Further, the majority suggests a possible motive that is based on pure speculation; on the contrary, the record contains no evidence of a motive in this case— and the "absence of motive is a circumstance from which a jury can draw an inference of innocence." *Krummacher*, 269 Or at 142. Finally, the majority overstates the evidence from which the jury could infer that defendant lied or evinced consciousness of guilt.

I begin by addressing the evidence that the majority contends was sufficient to support guilt beyond a reasonable doubt. In paragraphs numbered 1 through 3 and 5, 279 Or App at 765, 767, the majority details a number of pieces of evidence that support reasonable inferences that defendant had the opportunity and ability to cause the victim's death, and the majority's description of that evidence and those permissible inferences is correct, as far as it goes. There is no dispute that defendant is the last person known to see the victim before she disappeared. There is no dispute that he had lived 80 feet from where her remains were recovered almost 12 years later. The jury indeed could infer that defendant possessed knives which might have been used to stab her, that he was physically capable of dragging her body to the field where her remains were found, of concealing the body, and of wrapping it with duct tape, and that he knew that the field was not maintained. Certainly that evidence explains why defendant was a target of the investigation and feels compelling in the face of an otherwise unsolved murder of a youthful victim.

However, that evidence does not dispel reasonable doubt as to defendant's guilt because it could equally be

true of any number of other persons. The fact that defendant was the last person *known* to see the victim before she disappeared on that Wednesday night in 1996 does not dispel reasonable doubt that he was the last person *actually* to see her. Indeed, though defendant's last encounter with the victim occurred in a rural area, the undisputed evidence established that defendant's trailer was a short walk from the victim's church (where she had told her mother she would be and where defendant consistently claimed she was headed when she left his trailer), and witnesses estimated that 800 adults and up to 1,500 people visited that church on a typical Wednesday evening in 1996. The area where the victim was last seen was not so remote that it is beyond reasonable doubt that, after departing from defendant's trailer, the victim encountered someone else who possessed a knife (or other weapon), duct tape, and the ability to drag her 120-pound body. Those characteristics might apply to any number of unknown individuals—indeed, they would apply to most adults and many teenagers.[1] Without a murder weapon or other physical evidence linking defendant to the victim's disappearance or her death, the jury would have to speculate to conclude that defendant caused her death.[2] It could not do so beyond a reasonable doubt on the evidence presented here.[3]

---

[1] Indeed, the victim's boyfriend and his stepfather gave inconsistent statements about his encounters with the victim shortly before her disappearance, and an investigator testified that, shortly after the victim's disappearance, a search dog twice alerted on the trunk end of a car belonging to an unknown person.

[2] Indeed, contrary to the majority's assertion that it was reasonable to infer that the victim's death was caused by a wound that could have been inflicted by the kind of instrumentalities that defendant possessed, 279 Or App at 767, the jury would have to speculate to conclude that the victim was killed by a knife at all. The state's witnesses testified only that the victim's death was a homicide and that blunt force trauma couldn't be "excluded" as a possible method of her death, but really couldn't say what happened to cause her death, given the lack of a murder weapon and the degraded state of her remains when they were found more than 11 years after her disappearance.

[3] Contrast the circumstances in this case with those of *Krummacher*, in which the uncommon properties of the bullets and firearm that killed the victims in that case and to which the defendant and her husband had access created an inference that the defendant, and not her husband (because the evidence indicated that he could not have killed the victims), was guilty of the murders. 269 Or at 140. That is, the forensic evidence in *Krummacher* suggested a known universe of persons responsible for killing the victims, for which, ultimately, only the defendant could have been responsible.

The majority acknowledges the undisputed evidence that numerous searches of defendant's trailer and his property after the victim's disappearance did not result in the discovery of her body or the seizure of incriminating evidence, and that no human blood was found within the trailer, but posits that it was the jury's prerogative to assign to that evidence whatever weight it saw fit and that the jury was nevertheless free to infer that defendant possessed the knowledge and means to cause the victim's death and dispose of her body. 279 Or App at 765-67. However, the majority has failed to engage with the question of the effect of that undisputed evidence, and the inferences of innocence that flow therefrom, on the existence of reasonable doubt. There is no dispute that defendant had the knowledge and means to cause the victim's death and dispose of her body—but so might any number of other unknown persons. In that light, the fact that no other evidence materialized despite numerous and extensive searches, the lack of any DNA evidence connecting defendant to the victim's remains,[4] and the lack of any human blood in defendant's trailer contributes to reasonable doubt as to whether he, among all others with the means to cause the victim's death, was the person who did so.

Moreover, the undisputed evidence established that numerous searches were conducted, by police and others, of the area around where the victim was last seen. No one could say for sure whether the grassy area where the victim's body was eventually found had been searched, but it is hard to imagine that an area so close to defendant's trailer would have been neglected. No time of death could be established from the state of the victim's remains and, though the evidence allowed the jury to infer that the victim's body was dragged there shortly after her death,[5] no one could establish that the victim died the night that she disappeared, as opposed to being held for some period of time before being

---

[4] An expert testified that DNA found on the duct tape which apparently had been wrapped around the victim's body could not have belonged to defendant.

[5] The evidence of how long the victim's remains had been in the location where they were discovered is testimony from an Oregon State Police forensic scientist who concluded that the victim's remains had been there at least five years prior to their discovery in 2008. The victim disappeared in 1996, well before 2003.

killed and deposited in the field where her body was later found. Though the owners of the field testified that they avoided it due to a difficult relationship with defendant's family, the undisputed evidence established that defendant's family possessed horses and other animals that frequently trespassed onto the property and that defendant's mother and possibly other family members entered the field on regular occasions to retrieve those animals. That undisputed evidence casts doubt on the state's theory that defendant's knowledge of the property would have led him to consider it a place where he could deposit the victim's body and avoid detection.

The information about defendant's romantic interest in the victim posited by the majority, 279 Or App at 766, merely invites further speculation from the jury. From defendant's earlier acknowledgement that he (her teenage peer) found the victim attractive and may have had a crush on her and from her mother's report that the 15-year-old victim intended to remain chaste before marriage, the majority suggests that the jury could infer that the victim would have rebuffed any sexual advance by defendant. "Reasonable inferences are permissible; speculation and guesswork are not." *State v. Bivins*, 191 Or App 460, 467, 83 P3d 379 (2004). Speculation about what might have happened between two teenagers *if* defendant had made a sexual advance, particularly in the absence of any evidence that he did so, cannot be considered "evidence favorable to the state," 279 Or App at 766, unless used to further infer that defendant killed the victim after she rebuffed an unwanted sexual advance—a classic "stacking of inferences to the point of speculation."[6] *Bivins*, 191 Or App at 468.

Moreover, although the majority minimizes the damage it seeks to do by remonstrating that proof of motive is not essential to a conviction based on circumstantial evidence in any event, 279 Or App at 766, motive "is of major

---

[6] The state, at trial, certainly relied on a theory of sexual assault or romantic rejection as motive at trial. In asserting that "evidence of motive exists in this case," the prosecutor explained in closing arguments that defendant "may have tried to sexually assault [the victim] and taken things too far or he may have attempted to make sexual advances towards her and been rebuffed and reacted violently."

importance in a circumstantial evidence case" in providing the jury with a basis to get beyond reasonable doubt. *Krummacher*, 269 Or at 142 (citing *State v. Sack*, 210 Or 552, 556, 300 P2d 427 (1957)). As the Supreme Court has explained,

> "The absence of motive is a circumstance from which a jury can draw an inference of innocence. We do not believe that lack of motive alone gives rise to a sufficient inference of innocence to make impossible conviction by circumstantial evidence, [but] it certainly is a matter for consideration in weighing the convincing power of the [s]tate's case and thus whether there was proof from which guilt could be inferred beyond a reasonable doubt."

*Id.* at 142. This case lacks any nonspeculative evidence of motive, among the reasons why no reasonable jury could conclude beyond a reasonable doubt that defendant caused the victim's death.

Finally, the majority greatly overstates the evidence from which a rational factfinder could infer that defendant lied in a way that indicated consciousness of guilt. 279 Or App at 767-68. Defendant was 16 years old at the time of the victim's disappearance,[7] and was interviewed by various law enforcement agencies at least 33 times over many years. Although his statements varied in small ways, they were essentially quite consistent over all those years. The most significant inconsistency is that defendant initially indicated that he had "seen" the victim walk away from his trailer and later said that he had "heard" her walking away—yet those two statements were separated by over a decade, and the record does not indicate that the latter version was made in response to being confronted by investigators regarding the implausibility, because of darkness, of a claim to have seen the victim walk away. Perhaps a jury could infer that defendant knowingly altered his story many years later, but neither that possible inconsistency nor conflicting testimony about whether defendant's trailer had a porch light renders defendant's account so inconsistent and obviously fabricated to allow the jury to infer that defendant lied in order to

---

[7] According to the evidence, defendant had dropped out of school years before the victim disappeared, and eventually earned his GED sometime afterwards.

"cover up the event causing [the victim's] death," 279 Or App at 767, or that he was conscious of responsibility for causing it.

Moreover, those slight inconsistencies hardly compare to the wildly inconsistent stories and blatant falsehoods perpetrated by the defendant in *State v. Kader*, 201 Or 300, 333, 270 P2d 160 (1954), cited by the majority, 279 Or App at 767. That case involved very different circumstances in which the window of time identified as the time of the victim's death was narrow (about two-and-a-half hours), the manner of death was evident (asphyxiation), the defendant was present in the house when the victim died, and the defendant admitted to disposing of the victim's body but told multiple, obviously fabricated versions of what happened in a short period of time.[8] There, the defendant engaged in purposeful and patent obstruction very different from what is presented in this case, where the manner and time of the victim's death is not known, where the inconsistencies in defendant's testimony are minimal, and where defendant's only other statements indicating a consciousness of guilt are that (1) he "didn't know what to do" when told that "this would be the time" to provide "any information"; (2) he was "just not ready to" when asked "Why can't you tell us what happened?"; (3) when asked if the day the victim disappeared was a "do-over day," defendant replied, "Yes"; and (4) when asked whether he felt good about what happened to the victim, defendant replied, "No." The most that a jury could reasonably infer from those statements is that defendant knew something about the circumstances of the victim's disappearance, but the statements are insufficient to support an inference that defendant killed the victim.

Under our laws, the state has the burden to prove the essential elements of the crime beyond a reasonable doubt. Defendant does not have the burden of proving his innocence—innocence is presumed. If the burden of proof is to remain with the state, a defendant need not prove that he could *not* have committed the crime (though that sort of

---

[8] The defendant in *Kader* pointed, in turn, to an unknown man, her other child, and her stepfather as the person responsible for committing the crime. 201 Or at 305-15.

evidence is helpful), and though evidence that he *could* have committed the crime is necessary, it is not sufficient. The state's burden is to provide an evidentiary basis for the jury to conclude, without resorting to speculation, that defendant *did* commit the crime, beyond a reasonable doubt, and the court's task is to meaningfully engage the legal question of whether the state has done so. The evidence here, even when viewed in the light most favorable to the state and making reasonable inferences, fails to provide a reasonable jury with a sufficient basis to conclude, without resorting to speculation, that defendant caused the victim's death beyond a reasonable doubt.

Accordingly, I dissent.

Sercombe, Duncan, and Egan, JJ., join in this dissent.