Argued and submitted September 9, 2020, affirmed May 5, petition for review denied October 14, 2021 (368 Or 637)

STATE OF OREGON,
*Plaintiff-Respondent,*

*v.*

TIESHA L. BLEDSOE,
*Defendant-Appellant.*

Washington County Circuit Court
17CR73158; A168021

487 P3d 862

Defendant refused to show proof of her Tri-Met train fare and kept walking despite a police officer ordering her to stop. She was convicted of interfering with a peace officer, ORS 162.247(1)(b), for refusing to obey the order. On appeal, she assigns error to the trial court's denial of her motion for judgment of acquittal. She contends that she was engaged in "passive resistance," which is exempted from the crime of interfering with a peace officer under ORS 162.247(3)(b), because she continued on her course without altering her conduct in response to the officer's order. *Held*: The trial court did not err in denying the motion. ORS 162.247(3)(b)'s exemption for "passive resistance" does not apply to active, physical conduct like walking away from an officer. Defendant's proposed approach based on whether an individual alters his or her conduct is problematic both because it would permit an individual engaged in unlawful conduct to walk away from police when they approach and because it would criminalize several "textbook" passive resistance techniques that the legislature sought to protect.

Affirmed.

Andrew Erwin, Judge.

Anne Fujita Munsey, Deputy Public Defender, argued the cause for appellant. Also on the briefs was Ernest G. Lannet, Chief Defender, Criminal Appellate Section, Office of Public Defense Services.

Daniel Norris, Assistant Attorney General, argued the cause for respondent. Also on the brief were Ellen F. Rosenblum, Attorney General, and Benjamin Gutman, Solicitor General.

Before Lagesen, Presiding Judge, and James, Judge, and Kamins, Judge.

KAMINS, J.

Affirmed.

James, J., concurring.

## KAMINS, J.

Defendant refused to show proof of her TriMet train fare and kept walking despite a police officer ordering her to stop. She was convicted of interfering with a peace officer for refusing to obey the order and now assigns error to the trial court's denial of her motion for judgment of acquittal. On appeal, she contends that she was engaged in "passive resistance," which is not punishable under the statute, because she continued on her course without altering her conduct in response to the officer's order. Because we conclude that walking away is active, not passive, conduct, we affirm the trial court's denial of the motion for judgment of acquittal.

The relevant facts in this case are undisputed. Defendant was riding a TriMet train when she was approached by a TriMet rail supervisor and asked to show proof of fare. Defendant ignored the TriMet employee and, when the train arrived at the transit center, walked off the train away from the employee. The TriMet employee signaled uniformed police officers at the station, and one of the officers ordered defendant to stop and show fare. Defendant continued walking at a steady pace, despite the officer ordering defendant to stop and show proof of fare three more times. Eventually, two officers each took one of defendant's arms and stopped her forward motion.

Defendant was charged with interfering with a peace officer, ORS 162.247, for refusing to obey the officer's order.[1] She was tried by a jury, and, at the end of the state's case, she moved for a judgment of acquittal on the charge of interfering with a peace officer. As relevant here, defendant argued that, by continuing to walk away from the police officers, she was engaged in "passive resistance" which, under ORS 162.247(3)(b), exempts a person from the crime of interfering with a peace officer.

---

[1] Defendant was also charged with several other offenses relating to her failure to pay her fare and for kicking one of the arresting officers, including interfering with public transportation, ORS 166.116, harassment, ORS 166.065, criminal trespass in the second degree, ORS 164.245, and theft of services, ORS 164.125. The trial court granted a judgment of acquittal on the charge of second-degree criminal trespass, and the jury convicted defendant on all other counts. Defendant does not assign error to those convictions.

The trial court denied the motion, concluding that "[t]he charge is not resisting arrest, the charge is interfering with a lawful order, and here, there's sufficient evidence before this jury to determine that there was a lawful order given." The state asked the court to "make a specific finding as to this issue of passive versus active resistance," but the trial court refused "because resistance hasn't been charged." The jury convicted defendant of interfering with a peace officer, and she appeals that conviction, assigning error to the trial court's denial of her motion for judgment of acquittal.

In reviewing the denial of a motion for judgment of acquittal, we determine whether, viewing the evidence in the light most favorable to the state, any rational factfinder could have found the elements beyond a reasonable doubt. *State v. Simmons*, 279 Or App 756, 758-59, 379 P3d 580, *rev den*, 360 Or 697 (2016). When the dispute centers on the meaning of a statute, however, the issue is one of statutory construction, which we review for legal error. *State v. Hirschman*, 279 Or App 338, 344, 379 P3d 616 (2016).

On appeal, defendant renews her argument that her behavior of continuously walking before, during, and after the officer ordered her to stop was simply passive resistance that is exempted from criminal liability under ORS 162.247(3)(b).[2] The state responds that the trial court was correct to deny defendant's motion because continuing to move away from a police officer after being ordered to stop is "active" and therefore cannot constitute passive resistance.[3]

---

[2] We recently held that an officer's order for a passenger to show proof of fare is not lawful unless it is supported by an individualized reasonable suspicion that the passenger has committed a crime. *State v. Almahmood*, 308 Or App 795, 807, 482 P3d 88 (2021). Although defendant does not challenge the lawfulness of the officer's order to stop, the officer's testimony indicated that he developed individualized reasonable suspicion that defendant had not paid the fare when he heard the TriMet employee asking defendant to show proof of fare but observed her ignore the employee and walk away.

[3] The state also argues, for the first time on appeal, that passive resistance is an affirmative defense that defendant had the burden to prove at trial or even if passive resistance is a standard, not an affirmative defense, defendant did not properly "raise" it. Because we affirm the denial of the motion for judgment of acquittal, we do not address this argument.

        The parties' arguments present conflicting inter-
pretations of the conduct that is subject to liability under
ORS 162.247. ORS 162.247(1)(b) provides that a person com-
mits the crime of interfering with a peace officer when the
person, "knowing that another person is a peace officer,"
"refuses to obey a lawful order" given by that peace officer.[4]
ORS 162.247(3)(b) creates an exemption, providing that the
statute "does not apply" to "[p]assive resistance." To resolve
this dispute, we must determine the meaning of "passive
resistance" for purposes of ORS 162.247(3)(b).

        Our goal in construing the statute is to "discern the
legislature's intent *** looking primarily to the statute's
text, context, and legislative history." *State v. McNally*, 361
Or 314, 321, 392 P3d 721 (2017) (citing *State v. Gaines*, 346 Or
160, 171-72, 206 P3d 1042 (2009)). The Supreme Court has
already had the opportunity to interpret the phrase "pas-
sive resistance," although for a different reason—to deter-
mine whether a defendant's conduct must involve an act or
technique used during governmental protests to qualify as
"passive resistance." *McNally*, 361 Or at 318, 321. Because
"passive resistance" is undefined in the statute, the court
looked to its "plain, natural, and ordinary meaning." *Id.* at
321. Finding the phrase to be a term of art, the court con-
sulted both *Webster's Third New Int'l Dictionary* and *Black's
Law Dictionary*, observing that the phrase has "the same
meaning whether considered in a lay or a legal context."
*Id.* at 322. Under either definition, "passive resistance
is opposition to an exertion of a government or occupying

---

    [4] ORS 162.247 provides that,

        "(1) A person commits the crime of interfering with a peace officer or
    parole and probation officer if the person, knowing that another person is a
    peace officer or a parole and probation officer as defined in ORS 181A.355:

        "* * * * *

        "(b) Refuses to obey a lawful order by the peace officer or parole and pro-
    bation officer.

        "* * * * *

        "(3) This section does not apply in situations in which the person is
    engaging in:

        "(a) Activity that would constitute resisting arrest under ORS 162.315;
    or

        "(b) Passive resistance."

power—a refusal to cooperate with that government or occupying power—without use of violence or active conduct." *Id*.

Because the legislative history discussed a desire to insulate protest or civil disobedience from liability, the court acknowledged that the legislature "had in mind protecting from arrest individuals who were engaged in a peaceful political protest or some other kind of nonviolent civil disobedience." *Id*. at 336. However, the court observed that this "legislative history does not suggest that the legislature intended the phrase 'passive resistance' to apply *only* in those situations." *Id*. (emphasis in original).

Accordingly, the court concluded that, for purposes of ORS 162.247(3)(b), passive resistance encompasses "noncooperation with a lawful order of a peace officer that does not involve active conduct." *Id*. at 339. Put another way, "the two central elements of 'passive resistance,' as used in ORS 162.247(3)(b), are the 'passive,' as opposed to active, nature of the defendant's conduct, and the notion of noncooperation with or refusal to obey a government agent's order." *Id*. at 323.

As there is no dispute that defendant was noncooperative with the officer's order, our inquiry is focused on the first element: "passive, as opposed to active" conduct. As passive is defined by what it is not—active—we turn to a dictionary to understand the term "active." In a lay dictionary, active is defined as "characterized by action rather than by contemplation or speculation; productive of action or movement; expressing action as distinct from mere existence or state." *Webster's Third New Int'l Dictionary* 22 (unabridged ed 2002).[5] The legal dictionary defines "active conduct" as "[b]ehavior that involves a person doing something by exerting will on the external world." *Black's Law Dictionary* 370 (11th ed 2019).

These definitions, requiring physical movement or other impact on the external world, are consistent with the analysis in *McNally*. Although the court did not define the meaning of "active," it acknowledged that "a person who runs away when lawfully ordered by a peace officer to stop"

_____

[5] *Webster's* example of an "active verb" is "walks." *Id*.

is not *passively* resisting. *McNally*, 361 Or at 335. On several occasions, the court equated "active" conduct with "physical" conduct. In acknowledging the state's concern that many cases involving interfering with a police officer involve passive resistance, the court noted that, "[p]erhaps the majority of refusals to obey a lawful order of a peace officer are in fact passive, but it also is not difficult to conceive of scenarios in which a person actively, physically, refuses to obey." *Id*.

This case presents one of these "scenarios." *Id*. There is no dispute that defendant was engaged in active, physical movement—the activity of walking. And there is no dispute that she refused to obey the order to stop.

An examination of the *McNally* concurrence confirms this understanding. 361 Or at 344-45 (Kistler, J., concurring). Three justices concurred, parting ways with the majority over whether the exception was limited to activities associated with governmental protest. In so concluding, the concurrence observed that the term consisted of two components: "passive," which describes "the type of resistance," and "resistance," which implies "a requirement that a person refuse to comply with an officer's order for some reason, not for any reason or no reason at all." *Id*. at 341. Because the majority's focus was on "the nature of the resistance (passive as opposed to active) as the sole defining element," the concurrence disagreed with its construction. *Id*. at 344-45.

Of note, the concurrence worried that if any instance of a person "passively declin[ing] to comply" with an officer amounts to passive resistance, then "little is left" of the prohibition on interfering with a peace officer:

"It may be, as the majority notes, that a defendant can actively but peaceably refuse to comply with a lawful order. And it may follow that, as a result, the majority's definition of 'passive resistance' does not leave the prohibition in ORS 162.247(1)(b) completely devoid of content. However, the fact that the majority's interpretation does not eviscerate the prohibition is hardly a reason for embracing it if another interpretation reasonably gives greater effect to the prohibition."

*Id*. at 341-42. If defendant's active, peaceable conduct qualifies as passive resistance, then what "little is left" of the prohibition on interfering with a peace officer would vanish. Indeed, such an interpretation would mean that someone engaged in unlawful conduct who sees an officer approach can simply walk away—even if the officer has reasonable suspicion that they are committing a crime and orders them to stop as a result of that suspicion. So long as they began walking before the officer issues an order, they would be free to walk away.

Even more problematic, an approach like the one defendant proposes that turns on the cessation or continuation of conduct—as opposed to whether it is "active"—would criminalize conduct that the legislature sought to protect. If an officer attempts to direct a person who is already in motion, the person could not passively resist the order by stopping, sitting down, or taking any action that typically amounts to passive conduct. *See, e.g.*, *Saulny v. New Orleans Police Dep't*, ___ So3d ___, 2020 WL 1173590 at *4 (La Ct App 2020) (recognizing "'text book' passive resistance" as folding one's arms and refusing to comply). If the person decides to stop at that point, it would amount to a cessation of prior conduct and would, under defendant's rationale, not constitute passive resistance.

Excluding walking and other active, physical conduct from "passive resistance" is faithful to the *McNally* court's effort to "criminalize[ ] the obstruction of the work of the government and peace officers through active physical conduct, while at the same time broadly respecting constitutional principles of freedom of speech and assembly." 361 Or at 338. Although defendant did not alter her conduct when the order to stop came, passive resistance does not turn on the cessation or the continuation of conduct. Conduct that is active and noncooperative does not amount to passive resistance.[6]

Affirmed.

---

[6] We share the significant concerns raised by the concurrence about the inequities in the administration of justice which, as the concurrence acknowledges, are outside our scope of review in this case.

**JAMES, J.,** concurring.

On the discrete legal issue presented on appeal—whether, when faced with an order to stop, a defendant's continued walking qualifies as "passive resistance" such that the conduct does not constitute the crime of interfering with a peace officer (IPO), ORS 162.247—I concur with the majority that it does not. Based upon the Oregon Supreme Court's interpretation of "passive resistance" in *State v. McNally*, 361 Or 314, 335, 392 P3d 721 (2017), in particular the court's observation that "a person who runs away when lawfully ordered by a peace officer to stop would violate ORS 167.247(1)(b) and would not be engaged in passive resistance," the majority correctly reasons that "active" conduct is not passive resistance, and movement is, by definition, active. I agree that *McNally* appears to dictate the result here. Accordingly, after being given an order to stop, defendant's continued movement, no matter how leisurely, and no matter that it in no way seriously threatened to interfere with the officer's ability to ultimately take defendant into custody, was not passive resistance, and that continued movement could constitute a refusal to obey a lawful order sufficient to sustain a conviction of interfering with a peace officer. I write separately, however, for two reasons. First, I write to illuminate the challenges that ORS 162.247 poses to the equitable administration of justice in Oregon. Second, I write to illuminate what this record reflects about the way the law was applied to this particular defendant.

The defendant in this case, Tiesha Bledsoe, is a Black woman who grew up in Oregon. At the time of this incident, she was 38 years old and appears to have had no Oregon criminal record for the first 36 years of her life. However, beginning in 2016, Ms. Bledsoe began to have a series of encounters with law enforcement resulting in arrest—almost all for low-level offenses mostly involving TriMet. The vast majority of those arrests, for petty crimes like failure to pay a fare, or trespass in the second degree, either were not prosecuted, or prosecution began but then the case was dismissed.

On November 1, 2017, Ms. Bledsoe was on a TriMet train headed to the Beaverton transit station when she was

approached by a fare inspector. The inspector asked to see her fare, but she did not respond. When the train pulled into the stop, Ms. Bledsoe exited the train, and calmly walked towards an officer on the platform. Alerted by the fare inspector, two officers ordered her to stop and show her fare. She did not acknowledge them. One officer allowed her to pass him, then fell in behind her. He ordered her to stop and show her fare three times, but she did not respond or acknowledge the officer. Her course and pace of travel did not change. By all accounts, it was a calm and leisurely affair that ended in the officers grabbing Ms. Bledsoe's arms from behind and arresting her, for, among other things, failure to pay a fare, and interfering with a peace officer, ORS 162.247, for her refusal to comply with the orders to stop.

The record does not reflect why defendant didn't acknowledge the fare inspector or why she continued to walk away from the officer without speaking to him. But, by the time of this encounter, she had already been arrested, jailed, then released, for minor offenses like trespass in the second-degree multiple times. We should not ignore the backdrop of those encounters: A Black Oregonian in the Portland metro area is 4.9 times as likely to be arrested for second-degree trespass as a white Oregonian. *See Racial and Ethnic Disparities in Multnomah County*, 2019, https://www.documentcloud.org/documents/6559824-Multnomah-R-E-D-Analysis-2019-Final-November-19.html (accessed Apr 4, 2021). And the stakes of those encounters are higher. Black Americans, on the whole, are at least 2.5 times more likely to be shot and killed in police encounters than white Americans. *United States v. Knights*, 989 F3d 1281, 1296 (11th Cir 2021) (Rosenbaum, J., concurring) (citing, in part, *Jamison v. McClendon*, 476 F Supp 3d 386, 390-91 n 1-19 (SD Miss 2020) (cataloguing some Black Americans' deaths in police encounters)).

Ultimately, defendant was incarcerated in the Washington County Jail. On November 2, 2017, the court arraigned defendant in her cell. As noted by the public defender present, "She was lying on her bed with the blanket over her head, so I was unsure about how much she heard from what we told her." Defense counsel did not ask for her release, and no release decision was made at that

time. The court set a future status date of November 27, 2017, and defendant remained in jail.

While defendant remained in jail, her court-appointed attorney attempted to meet with her, but she did not leave her cell. The records before us on appeal include no medical records or history to suggest mental illness; it appears that, based solely on her refusal to leave her cell, counsel filed a motion asking the court to have defendant evaluated for her mental capacity to aid and assist in her defense, under ORS 161.370. On November 27, 2017, defendant again refused to leave her cell and the court ordered her committed to the Oregon State Hospital for evaluation.

After roughly six weeks at the Oregon State Hospital, Ms. Bledsoe was evaluated by a psychiatrist. According to the doctor, Ms. Bledsoe was perfectly cognizant of her circumstances. When asked about her understanding of the nature of her hospitalization and evaluation, she responded, "[t]o see if I understand what is going on as far as court, and if I am able to basically respond. *** Told I have to be here. No other choice but to [participate]."

During the interview, the doctor asked Ms. Bledsoe about her general mood, to which she replied, "Well, I've been in jail so, I wouldn't say it's ah down but I'll say more like kind of bored. In a cell 24 hours a day." When asked about why she remained in her cell, and why she didn't engage with people in the jail, Ms. Bledsoe stated, "I do nothing. Stay to myself. Only way how to do it. Stay to yourself and stay out of trouble."

Ultimately, the doctor found Ms. Bledsoe engaging and informed. She understood the court system, the role of her attorney, and how to present a defense. She displayed no symptoms of any mental illness or substance abuse. The interview ended with Ms. Bledsoe telling the doctor, "Hope I don't see you again," which the doctor found humorous.[1]

---

[1] It appears from the record that Ms. Bledsoe was at the Oregon State Hospital at least six weeks. The cost to the State of Oregon to send a defendant to the hospital for an aid and assist evaluation is approximately $1,324 per day. Gordon R. Friedman, *Costly, ineffective, cruel: How Oregon ensnares mentally ill people charged with low-level crimes*, The Oregonian (Jan 27, 2019), https://www. oregonlive.com/news/g66l-2019/01/a646cacb3c6955/costly-ineffective-cruel-how-oregon-ensnares-mentally-ill-people-charged-with-lowlevel-crimes.html

On February 1, 2018, upon being returned to the Washington County Jail, the court held a status hearing. At that time, despite the psychological report, defense counsel indicated his intent to contest the findings, believing defendant still unable to aid and assist. That further hearing was set another five weeks out—five weeks defendant would remain in jail before her trial, unless she began cooperating with counsel:

> "[DEFENSE COUNSEL]:   And Your Honor, we are requesting a contested hearing about five weeks out. That— that could very well go away, Your Honor. I will note that I have tried to meet—I or a person from my office has tried to meet with [defendant] five times during the pendency of this case, and every time that has been refused. This is the first time that I've actually been able to speak with [defendant]. I'm hoping that we can talk going forward, if—if we are, we'll have discussions, then that might go away. But right now I still have concerns."

Counsel eventually moved, a second time, to have defendant declared unable to aid and assist, but that motion was denied.

Eventually, on May 3, 2018, 183 days after she first entered custody for her suspected failure to pay her TriMet fare—six times longer than the maximum 30-day sentence for that crime allowable by law, but within the 364-day maximum for IPO—the State of Oregon tried defendant. She was not present for her trial, remaining instead in her cell. The jury found her guilty, and the trial court, expressing some frustration with this case, refused the state's request for formal probation, entering a sentence of discharge on all counts.

Based on a failure to pay a train fare, and her "refusal to obey" an order by calmly continuing to walk down the train platform, Ms. Bledsoe spent six months incarcerated in Oregon awaiting trial. Her experience in the criminal justice system—and specifically with the charge of IPO—is, unfortunately, not unique; it is mirrored by many persons in Oregon who live in the margins, and who find themselves

---

(accessed Apr 26, 2021). The ballpark cost in Ms. Bledsoe's case would be, very roughly, $55,608, or a little over 22,000 TriMet tickets.

caught in a revolving door of low-level petty offenses and frequent police contact. That police contact eventually, and invariably, gives rise to a charge of IPO. And, as was the case here, those charges can contribute to extended deprivations of liberty before the charges are even tried.

ORS 162.247 is a challenging law in application. It aims to protect an officer's ability to carry out their sworn duties—an undeniably necessary goal. However, unlike many crimes, the acts that can support a charge of IPO can vary widely. The statute offers no limitation on the nature of the lawful order given by an officer, nor does it limit the seriousness of the circumstances under which a refusal to obey the order is a crime. Despite police-citizen encounters being highly fact specific and often turning on the totality of the circumstances, for purposes of ORS 162.247, all police orders are treated the same.

Additionally, the statute offers no guidance on what it means to "refuse to obey" an order. The statute does not define what constitutes refusal, nor does it link the refusal to the creation of an officer or public safety risk. Whether a person is arrested for IPO largely turns, therefore, on the subjective perceptions of the officer who is left to differentiate between mere reluctance or delayed acquiescence, from refusal. As such, ORS 162.247 is, in essence, an *attitude* crime.

Whether a defendant is arrested and charged with IPO, in addition to whatever was the basis of the stop originally, largely turns on the subjective perceptions of the officer about the attitude of the defendant during the police-citizen encounter. That subjective aspect of IPO provides an open door for implicit bias. As has been acknowledged,

> "the enforcement of IPO can at times appear arbitrary, and even those who believe they are complying with an order may find themselves subjected to the charge. *** [T]he data reflects significant racial disparities in the relative rates of arrest for the crime of IPO. Per the [Oregon] Criminal Justice Commission, a Black person is roughly three and a half times more likely to be arrested for IPO than their overall representation in Oregon's census would suggest."

Testimony, House Committee on Judiciary, HB 3164, Feb 24, 2021, (statement of Aaron Knott, Multnomah County District Attorney's Office).

This subjective aspect of IPO has real world consequences. IPO is a Class A misdemeanor—the most serious misdemeanor, punishable by up to 364 days in jail. For petty offenses—Class B and C misdemeanors—it is exceedingly rare for a defendant to be held in jail. But the presence of a Class A misdemeanor can, and does, affect release decisions and the setting of bail amounts. The result is that, for all practical purposes, a defendant can remain incarcerated awaiting trial not for the crime for which they were stopped, but for the officer's subjective interpretation to how they reacted to being stopped.

Previously, the sole limitation on this otherwise broad and subjectively applied statute was the exclusion of passive resistance. There is no dispute that the legislative intent of the statutory language excluding passive resistance was to protect peaceful political protest activity. *See McNally*, 361 Or at 331 ("[T]he legislative history of the amendments to ORS 162.247 is replete with statements indicating the legislature's interest in ensuring that nonviolent political protestors would not be punished under ORS 162.247."). However, in the wake of *McNally*, the passive resistance exclusion does not apply for a defendant who makes any kind of movement. A step forward or back, a turn of the body or head—these are all actions. Virtually any human act short of rigid immobility in response to an order does not qualify as passive resistance under this interpretation. The ironic end result is that the quintessential peaceful political protest activity—the march—is not protected. Under our reasoning in this case, dictated by *McNally*, a political protestor engaged in a peaceful march, when lawfully ordered by a police officer to stop that protest activity, must comply, and continuing to peacefully march constitutes unlawful active, not passive, resistance. This is required under *McNally*, but it is clearly and obviously contrary to legislative intent.

Whatever minor limitation the legislature's exclusion of passive resistance placed on this statute has been effectively undone by the holding in *McNally*. ORS 162.247

will continue to be subjectively applied, disproportionately, against communities of color, the poor, and the marginalized. IPO charges will continue to accompany smaller petty offenses, and thereby elevate the seriousness of a criminal case by virtue of its status as a Class A misdemeanor, resulting in more people held in jail pretrial, at significant expense to Oregon taxpayers, and resulting in significant disruption to lives, families, and communities.

Despite those concerns with ORS 162.247 however, they are the expressions of one judge on an intermediate appellate court positioned in a much wider world. It is unquestionably the role of the legislature to declare which acts are so offensive to society that they should be criminalized, and to penalize them accordingly within constitutional limits. *State v. Smith*, 128 Or 515, 524, 273 P 323 (1929) ("The power to declare what punishment may be assessed against those convicted of crime is not a judicial, but a legislative, power, controlled only by the provisions of the Constitution."). When the legislature has enacted a statute, it is not the role of a court to "insert what has been omitted, or to omit what has been inserted." ORS 174.010; *see also PGE v. Bureau of Labor and Industries*, 317 Or 606, 611, 859 P2d 1143 (1993). And when the Supreme Court has interpreted a statute, it is the role of lower courts to faithfully adhere to that ruling.

Accordingly, I concur in the judgment in this case. But even still, there is a role to play. Judicial opinions serve many functions, and one of those is journalistic. Our opinions are dispatches from the edge—moments, recounted for posterity, of how Oregon's laws—like ORS 162.247—and the lives of its citizens, intersect. In the case of Ms. Bledsoe—from her arrest, to her trip to the state hospital, her six months in jail, and her trial in absentia—the law was ever present; justice, in my view, not so much.

I respectfully concur.